**MAGNOLIA GAS COMPANY & MKP Production Company, Appellants,**

**v.**

**KNIGHT EQUIPMENT & MANUFACTURING CORPORATION, Appellee.**

**No. 04–98–00156–CV.**

Court of Appeals of Texas, San Antonio.

Sept. 23, 1998.

Daniel D. Chapman, Cline H. White, Miller, Sission, Chapman & Nash, P.C., San Antonio, Brian L. Peterson, Elias, Books, Brown, Peterson & Massad, Oklahoma City, OK, for Appellant.

Jeffrey I Kavy, Tyler Scheuerman, Clemens & Spencer, P.C., San Antonio, Charles F. Wetherbee, Law Offices of Steinle & Wetherbee, Jourdanton, for Appellee.

Before HARDBERGER, C.J., and GREEN and DUNCAN, JJ.

## OPINION

GREEN, Justice.

This accelerated appeal arises from the trial court's denial of the special appearances of Magnolia Gas Company and MKP Production Company. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (Vernon Supp.1998). Because we hold the trial court lacked jurisdiction over Magnolia and MKP, we reverse its order and dismiss the case against them.

### Factual and Procedural Background

Knight Equipment & Manufacturing Corporation (KEMCO) sued Magnolia and

MKP in Atascosa County for breach of contract, in quantum meruit, on sworn account, and for civil conspiracy and fraud. KEMCO is a Texas corporation with its principal office in Jourdanton, Texas. Both Magnolia and MKP are nonresidents of Texas.

KEMCO owned a cryogenic gas processing plant in Kellyville, Oklahoma. In February 1996, KEMCO contracted with M & M Gathering, LLC to dismantle that plant and to refurbish, transport, and install it at M & M Gathering's plant in McKamie, Arkansas.[1] M & M Gathering subsequently assigned its rights and obligations under this contract to Magnolia and MKP in September 1996.[2] The assignment was negotiated in Oklahoma, where it was ultimately executed. The contract is entitled "Agreement for Movement, Refurbishment and Installation of Cryogenic Gas Plant Facility" and is simple in concept:

WHEREAS, [Magnolia's and MKP's assignor] desires to have installed at its McKamie Plant location in Lafayette County, Arkansas, a Cryogenic Gas Plant and related treating facilities to allow recovery of gas liquids and removal of inerts; and

WHEREAS, [KEMCO] has in its inventory the Cryogenic Gas Plant known as [the] Kellyville plant near Kellyville, Oklahoma, and desires to engineer, refurbish, and install said plant and related treating facilities at the McKamie location for [Magnolia's and MKP's assignor];

NOW, THEREFORE, IT IS MUTUALLY AGREED, AS FOLLOWS:

ARTICLE 1 SCOPE OF WORK

[KEMCO] shall furnish materials and supplies, and shall design, fabricate, re-

---

1. M & M Gathering is also a defendant in the underlying litigation, although it has not joined in this appeal. The managing member of M & M Gathering is M & M Gas Processing, an Oklahoma corporation that was originally a member of Magnolia and MKP.

2. Magnolia, an Oklahoma limited liability corporation, was formed to own and operate the Arkansas plant. MKP, also an Oklahoma limited liability corporation, was formed to own and operate an oil and gas field in Arkansas.

condition, modify, transport and assist in start-up of a Cryogenic Gas Plant and related treating facilities at [Magnolia's and MKP's assignor's] McKamie, Arkansas location, in accordance with the Exhibits which are attached hereto and made a part hereof. . . .

The heart of the jurisdictional dispute in this case arises out of a brief description under the first of twelve items listed to be performed by KEMCO, the contractor, under the "project scope" exhibit attached to the contract, which says KEMCO agreed to "dismantle, remove, and transport all Kellyville equipment to *contractor's yard.* . . ." KEMCO says it informed Magnolia and MKP that its yard was in Jourdanton, Texas, and therefore Magnolia and MKP knew at least a portion of the contract would be performed in Texas. The affidavit of Deral Knight, chief executive officer of KEMCO, states that the Jourdanton plant performs the refurbishing work under its contracts, and that Magnolia and MKP knew this because they were given copies of the KEMCO brochure which includes this information. KEMCO further asserts that Magnolia and MKP, exercising due diligence prior to the contract's assignment, acquired knowledge that a portion of the contract was to be performed in Texas. KEMCO estimates its performance in Texas comprised eighty percent of the engineering and refurbishment called for by the contract—"the majority of the work contemplated by any party." Magnolia and MKP contend neither they, nor the contract assigned to them, required performance in Texas. George N. Keeney, III, vice president of Okland Oil Company, the managing member of MKP, admitted in his deposition, however, that he knew some of the work under the contract would be performed in Texas and that some of the materials for the Arkansas plant would also originate there.

The remaining record evidence of activities undertaken by Magnolia and MKP in Texas involves the parties' course of dealing after the contract assignment. First, Magnolia and MKP remitted payment to KEMCO's bank account in Texas. Second, James Moore, an engineer for the Arkansas plant and Magnolia and MKP's designated representative for the project, lived in Texarkana, Texas during the plant's installation. By affidavit, Moore stated that M & M Gas moved its principal place of business to Texarkana, Texas in March 1997, and that Magnolia and MKP reimbursed him for his expenses while residing in Texarkana. Magnolia and MKP assert they did not direct Moore to live in Texas and hypothesize that either Moore chose to live there or did so at M & M Gas' direction. Finally, Magnolia and MKP hired an engineering consultant from Richardson, Texas to evaluate the Arkansas project.

Additional activity taking place in Texas transpired once performance under the agreement was questioned. For example, Magnolia and MKP attended a meeting at the Jourdanton plant to discuss conflict over the second set of change orders. Magnolia and MKP contend that KEMCO insisted they travel to Texas for the meeting. Furthermore, the parties met in the Dallas office of Energy Income Fund, the project's lender, to review performance under the agreement. Although the lender's principal office was in Massachusetts, the meeting was held in Dallas at its request.

According to George Keeney's affidavit, disputes between the parties arose in spring 1997. Complaints about KEMCO's performance included inferior quality and workmanship; untimeliness; the propriety, approval, and amount of KEMCO's change orders;[3] failure to pay third-party vendors, suppliers, and laborers; failure to keep the plant free of encumbrances; a stated intent to cease work; and failure to

---

**3.** According to the contract at issue, change orders are either (1) the client's requests for work done outside the original scope of the contract, or (2) the contractor's developments in design and scope approved by the client.

address other deficiencies identified by Magnolia. On September 26, 1997, Magnolia and MKP filed a declaratory judgment action against KEMCO in an Arkansas federal court. The parties dispute whether KEMCO received notice of the filing. On September 30, 1997, KEMCO filed the suit in Atascosa County from which this appeal arises.

On November 26, 1997, Liberty Supply, Inc. filed suit in Arkansas state court against KEMCO to recover for materials and supplies it provided to KEMCO for use in KEMCO's contract with Magnolia and MKP. On January 26, 1998, the same day the Atascosa court held its hearing on the special appearances at issue in this appeal, KEMCO filed an amended original answer and a third-party claim against Magnolia and MKP, alleging Magnolia and MKP breached the contract underlying this appeal.[4]

## STANDARD AND SCOPE OF REVIEW

■ In a special appearance, the non-resident defendant bears the burden of negating all bases of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985). The parties to this appeal maintain we review the evidence for factual sufficiency while we review legal conclusions *de novo. See Nikolai v. Strate*, 922 S.W.2d 229, 236 (Tex. App.—Fort Worth 1996, writ denied). Although we agree that we review the lower court's legal conclusions *de novo,* we disagree that we review the record of an

interlocutory appeal for factual sufficiency of the evidence.

■ Trial court decisions derived from both factual determinations and legal conclusions are generally reviewed for an abuse of discretion. *Pony Express Courier Corp. v. Morris,* 921 S.W.2d 817, 820 (Tex.App.—San Antonio 1996, no writ). Personal jurisdiction involves questions of law and fact. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 230–31 (Texas 1991). Thus, the abuse of discretion standard is more appropriate than factual sufficiency review, at least in the interlocutory setting.[5]

■ Under the abuse of discretion standard, we may not substitute our judgment for that of the trial court regarding its resolution of factual issues, and we cannot disturb its decision absent a showing of arbitrariness or unreasonableness. *See Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992). Magnolia and MKP must therefore establish that the trial court could reasonably have reached only one conclusion. *See id.* Where controlling legal principles are concerned, we exercise less deference and examine whether the trial court analyzed and applied the law correctly. *Id.* The trial court abuses its discretion when it misapplies the law. *See Landon v. Jean–Paul Budinger, Inc.,* 724 S.W.2d 931, 935 (Tex.App.—Austin 1987, no writ). If legally correct, its ruling is immune from appellate revision. *Id.* at 936.

**4.** At oral argument, KEMCO asked this Court to take judicial notice of the dismissal of the federal lawsuit. Magnolia and MKP added that two lawsuits, in addition to the suit filed by Liberty Supply, have been filed in Arkansas state court by KEMCO's suppliers.

**5.** We express no opinion about the propriety of factual sufficiency review in post-trial appeals of special appearances. *Compare NCNB Texas Nat'l Bank v. Anderson,* 812 S.W.2d 441, 442–43 (Tex.App.—San Antonio 1991, no writ) (applying factual sufficiency standard), *with Thorpe v. Volkert,* 882 S.W.2d

592, 596–97 (Tex.App.—Houston [1st Dist.] 1994, no writ) (applying abuse of discretion standard). We note, however, that although the courts of appeals label their review as one of factual sufficiency, in practice, they largely defer to the trial court's factual determinations while ruling de novo its legal conclusions. *See, e.g., MacMorran v. Wood,* 960 S.W.2d 891, 894–99 (Tex.App.—El Paso 1997, pet. denied); *Nikolai,* 922 S.W.2d at 238–40; *Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 632 (Tex.App.—Dallas 1993, writ denied).

Although Magnolia and MKP requested findings of fact and conclusions of law, the trial court entered none. Therefore, all questions of fact are presumed to support the judgment. *See Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex.1987); *Hawsey v. Louisiana Dep't of Soc. Svcs.*, 934 S.W.2d 723, 725 (Tex.App.—Houston [1st Dist.] 1996, writ denied). Because the appellate record contains a reporter's record, however, these findings of fact are inconclusive. *See Zac Smith*, 734 S.W.2d at 666.

## JURISDICTION

A nonresident defendant need not defend itself in a Texas court unless the exercise of jurisdiction over that party comports with both (1) the Texas long-arm statute, and (2) state and federal constitutional guarantees of due process. *Guardian Royal Exch.*, 815 S.W.2d at 226. The Texas long-arm statute permits the exercise of jurisdiction over nonresidents "doing business" in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). Although the statute enumerates certain acts which constitute "doing business," it contemplates that a nonresident's "other acts" may satisfy the "doing business" requirement. *See Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990).

The Texas Supreme Court has interpreted the statute's language broadly: jurisdiction over nonresident defendants is limited only by the federal constitutional requirements of due process. *See Guardian Royal Exch.*, 815 S.W.2d at 226; *Schlobohm*, 784 S.W.2d at 357. Accordingly, we must determine whether the trial court's exercise of jurisdiction over Magnolia and MKP survives a federal due process challenge, which involves a two-fold inquiry: (1) the defendants must have purposely established minimum contacts with the forum state; and (2) the exercise of jurisdiction must comport with "fair play and substantial justice." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

## 1. Minimum Contacts

Under the first part of the due process analysis, we consider whether the defendants purposefully availed themselves of the privilege of conducting activities within the forum state, thus enjoying the benefits and protections of its laws. *Burger King*, 471 U.S. at 474–75, 105 S.Ct. 2174 Our focus is on the defendants' intentional activities and expectations. In sum, for a Texas court to assert personal jurisdiction over them, the defendants' activities "must justify a conclusion that the defendant[s] should reasonably anticipate being called into court" here. *Id.; World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Personal jurisdiction is divided into two categories: specific and general. *See Schlobohm*, 784 S.W.2d at 357. KEMCO argues that Magnolia and MKP had sufficient minimum contacts with Texas, without attributing those contacts to either general or specific jurisdiction. Therefore, we consider both.

### a. General Jurisdiction

General jurisdiction is appropriate where continuous and systematic contacts tie the defendants to the forum state. *Guardian Royal Exch.*, 815 S.W.2d at 230. In deciding questions of general jurisdiction, we require a demonstration of substantial activities in the forum state. *Schlobohm*, 784 S.W.2d at 357.

KEMCO may not command the presence of Magnolia and MKP on the basis of general jurisdiction. Both Magnolia and MKP conduct the majority of their business within the state of Arkansas. They claim never to have sent goods into Texas, nor performed services in Texas. They further point out they have never owned any property in Texas, have never employed any people in Texas, nor sent any of their employees to Texas while working for them.

KEMCO presents little evidence to the contrary. In support of its position that Magnolia and MKP maintained ongoing, systematic contacts with Texas, KEMCO relies on the alleged partial performance of the contract in Texas, the residence of the representative in Texas that was reimbursed by Magnolia and MKP, the relocation of M & M Gas' principal place of business to Texarkana, the wiring of payments into Texas, and the two meetings that transpired in Texas.

The acts of Magnolia and MKP cited by KEMCO do not amount to ongoing and systematic contacts. Rather, Magnolia and MKP's connection to Texas implicates a single, albeit extended, business transaction. Accordingly, a ruling that Magnolia and MKP had sufficient minimum contacts to trigger general jurisdiction would be an abuse of discretion.

**b. Specific Jurisdiction**

We now consider whether the exercise of specific jurisdiction over Magnolia and MKP would be proper. Specific jurisdiction pertains to causes of action arising out of or relating to the defendants' contacts with Texas. *Guardian Royal Exch.*, 815 S.W.2d at 230. We therefore focus on the relationship among the defendants, the forum, and the litigation. *Schlobohm*, 784 S.W.2d at 357. Magnolia and MKP emphasize that specific jurisdiction arises only when the plaintiff's cause of action emanates from the nonresident's contact—rather than a third party's unilateral acts—with the forum state. In support, they cite KEMCO's alleged unilateral decision to refurbish components in Texas as well as the meetings attended in Texas necessitated by KEMCO's alleged failure to meet contract specifications. They maintain that neither entering into a contract with a Texas corporation nor sending payment to Texas make them susceptible

to suit here. Magnolia and MKP further emphasize that as assignees, they did not engage in any activities related to Texas that may have transpired during contract negotiation. Finally, MKP and Magnolia reason that because they already paid KEMCO for the work it performed at the Jourdanton yard, KEMCO's suit against them could not possibly implicate the work done in Texas. Responding, KEMCO relies on the alleged partial performance of the contract in Texas, reimbursement by Magnolia and MKP of the living expenses of the designated representative who lived in Texas, the relocation of M & M Gas's principal place of business to Texarkana, the wiring of payments into Texas, and the two meetings that transpired in Texas.

Magnolia and MKP's emphasis on their own conduct is correct. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Guardian Royal Exch.*, 815 S.W.2d at 227. Merely contracting with a Texas corporation does not satisfy the minimum contacts requirement. *See Burger King*, 471 U.S. at 478, 105 S.Ct. 2174; *Temperature Sys., Inc. v. Bill Pepper, Inc.*, 854 S.W.2d 669, 675 (Tex. App.—Dallas 1993, writ dis'd agr.). Furthermore, payments sent to the forum state are not determinative. *See Temperature Sys.*, 854 S.W.2d at 675; *cf. Bissbort v. Wright Printing & Publ'g Co.*, 801 S.W.2d 588, 589 (Tex.App.—Fort Worth 1991, no writ) (holding payments made in Texas satisfied minimum contacts where contract required it and litigation was about nonpayment). Similarly, minimum contacts may not be satisfied by merely engaging in communications with a Texas corporation during performance of the contract. *See Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205–08 (5th Cir.1996).[6]

---

**6.** Magnolia and MKP rely heavily on *U–Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760 (Tex.1977), in arguing minimum contacts may not be satisfied by a party making payments in the forum state for a contract partially

performed in the forum state. In *U–Anchor*, a Texas business, U–Anchor, constructed highway signs in Texas and then installed them in Oklahoma. The Oklahoma customer remitted monthly payments to U–Anchor's office in

Because these actions alone are not enough to compel Magnolia and MKP's appearance in a Texas court, KEMCO's partial performance of the contract in Texas is significant. *See Memorial Hosp. Sys. v. Fisher Ins. Agency, Inc.*, 835 S.W.2d 645, 650 (Tex.App.—Houston [14th Dist.] 1992, no writ) (recognizing the focus is on quality and nature, not quantity, of contacts). In particular, we focus on the refurbishment work because merely supplying materials from the Jourdanton plant would be a unilateral act on KEMCO's part.

Magnolia and MKP neither required nor bargained for the refurbishing work to be completed in Texas. *Cf. Fish v. Tandy*, 948 S.W.2d 886, 894 (Tex.App.—Fort Worth 1997, writ denied) (finding minimum contacts where defendant negotiated and contracted with Texas corporation through three personal trips, phone calls, and faxes to Texas); *Bissbort*, 801 S.W.2d at 589 (finding minimum contacts where defendant contacted Texas customer, contract required performance payment in Texas, and dispute involved nonpayment). Instead, as the contract assignees, Magnolia and MKP simply agreed to pay KEMCO to refurbish and relocate KEMCO's cryogenic gas plant to Arkansas and KEMCO agreed to do whatever was necessary to carry out the contract.

Indisputably, KEMCO is a Texas corporation with a refurbishing facility in Texas; Magnolia's and MKP's assignor, Magnolia, and MKP are all Oklahoma entities whose principal offices are located in Oklahoma; and the plant was to be constructed in Arkansas. As a result of this geographic diversity, it is certainly not beyond contemplation either that some part of KEMCO's performance (*e.g.*, refurbishing) and some part of Magnolia's and MKP's performance (*e.g.*, payment) might take place in Texas, or that the contracting parties were aware of this possibility at the time they entered the contract. For purposes of our review, we assume the trial court found this fact in support of its order—that is, at the time the contract was entered, both parties contemplated that some part of each party's performance would occur in Texas. This conclusion is inherent in the abuse of discretion standard of review.

■ But partial performance of a contract in Texas is not the *sine qua non* of personal jurisdiction. Rather, the dispositive question is one of law: are the defendant's contacts of a sufficient nature and quality that the exercise of personal jurisdiction comports with "fair play and substantial justice?" *Burger King*, 471 U.S. at 475–76, 105 S.Ct. 2174; *cf. Ornelas v. United States*, 517 U.S. 690, 698–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (explaining that appellate courts review a trial court's resolution of legal questions *de novo*, including its applying the law to the facts, but review a trial court's fact findings deferentially). We review conclusions of law *de novo*. *E.g. Walker v. Packer*, 827 S.W.2d at 840.

We conclude that Magnolia and MKP did not purposefully avail themselves of the benefits and protections of Texas law when they assumed the contract with KEMCO. The Texas contacts were entirely incidental and immaterial to the purpose of the contract and were not instigated by Magnolia and MKP, or their assignor. Thus, in the absence of facts amounting to minimum contacts, we hold the trial court abused its discretion by concluding it had personal jurisdiction over Magnolia and MKP.

## 2. Fair Play and Substantial Justice

■ We also hold that the assertion of personal jurisdiction over Magnolia and

---

Texas. The Texas Supreme Court held the only activity the Oklahoma customer engaged in was the mailing of payments into Texas, which was not enough to satisfy the due process minimum contacts requirement. This case, however, pre-dates the bifurcated analysis of general versus specific jurisdiction. Accordingly, we cannot assign *U–Anchor* the weight afforded it by Magnolia and MKP.

MKP would offend traditional notions of fair play and substantial justice. To avoid being haled into a foreign court, the defendants must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *See Burger King*, 471 U.S. at 477, 105 S.Ct. 2174. In this inquiry, we consider the following factors, where appropriate: (1) the burden on the defendants; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental social policies. *Id.; Guardian Royal Exch.*, 815 S.W.2d at 231. When the defendant has established minimum contacts with the forum state, the exercise of jurisdiction rarely fails the test of fair play and substantial justice. *See Guardian Royal Exch.*, 815 S.W.2d at 231.

Magnolia and MKP's burden of litigating in Texas appears considerable. Their gas processing facilities and offices, as well as the majority of related documents and witnesses, are located in Arkansas. Liens filed against the plant were filed in Arkansas, and the suppliers of plant materials, who have not been paid by KEMCO, are located in Arkansas. KEMCO contends that litigation in Arkansas would be burdensome to Magnolia and MKP given they are entities formed and located in Oklahoma. In light of the fact that Magnolia and MKP have already engaged in operations in Arkansas, litigating there would be less burdensome than in Atascosa County, Texas.

Texas' interest in being the forum state is tenuous. As a general proposition, Texas has an interest in providing its citizens with a forum for convenient and effective relief from breached contracts, fraudulent conduct, and conspiracies. However, KEMCO's ability to obtain convenient re-lief in its home state is weakened by the lawsuits, involving the same contract at issue here, that KEMCO must defend in Arkansas. At the time KEMCO filed suit, Magnolia and MKP had already paid approximately $3.7 million to KEMCO on a $3.9 million contract. The costs to KEMCO of litigating in both Texas and Arkansas could potentially outweigh its expectation under the contract.

Accordingly, KEMCO's interest in litigating in Texas does not weigh heavy in the balance. Although, in the abstract, it would be convenient for KEMCO to sue Magnolia and MKP in Texas, under this set of facts, it makes little sense. Since KEMCO filed suit in Texas, it has also been sued in Arkansas state court by at least one of the suppliers from whom it purchased materials; KEMCO then brought Magnolia and MKP in as third party defendants in that lawsuit. Furthermore, KEMCO should expect to defend itself in a foreign court because it regularly conducts business out of state.[7]

Finally, it appears that the interstate judicial system's interest, as well as the shared interest of the several states, would best be served by the suit proceeding in Arkansas. After all, that is where the bulk of the contract work appears to have taken place and where the plant will operate. In the interest of judicial economy, the disputes among all parties involved, whether they be the parties to the contract or the suppliers engaged during construction, would be best resolved in one proceeding.

## CONCLUSION

The trial court abused its discretion in ruling that Magnolia and MKP had minimum contacts with Texas and that requiring them to defend in Texas comported with fair play and substantial justice. We therefore reverse the trial court's order

---

7. According to its brochure, KEMCO engages in projects not only in the locations involved in this suit, but also in places as distant as Indonesia.

and dismiss the case against Magnolia and MKP.

HARDBERGER, Chief Justice, dissenting.

I believe it was within the trial court's discretion to deny the special appearances of Magnolia and MKP. I, therefore, respectfully dissent.

In determining whether a trial court abused its discretion, an appellate court must be deferential to the court's fact findings, reversing those findings only if the trial court could reasonably have reached only one decision. *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992). On legal questions, a reviewing court may be less deferential and may reverse a trial court if that court clearly failed to correctly analyze and apply the law. *Id.* at 840. As the majority points out, where no findings of fact are filed by the trial court, all facts are *presumed* to support the judgment. *Zac Smith & Co., Inc. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex.1987), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 986 (1988). While it is true that if a reporter's record is contained in the appellate record, those facts are not conclusive, *id.*, I do not take this to mean that the appellate court may, under an abuse of discretion standard, resolve factual disputes reflected by the record. *See id.* (presuming, in absence of findings but where reporter's record is included in record, that sole disputed fact supports trial court's finding); *Walker*, 827 S.W.2d at 839–40 (findings of fact may be reversed only if trial court could reasonably have reached one decision). The presumption that the facts support the judgment should only be overcome by an absence of supporting facts in the record. *See Otis Elevator*, 734 S.W.2d at 666. Otherwise, the deference given trial courts in their fact-finding roles would be meaningless. The majority finds an absence of facts in the record amounting to minimum contacts and that the assertion of personal jurisdiction over Magnolia and MKP would offend traditional notions of fair play and substantial justice. I disagree. This record presents nothing more than a factual dispute. The trial court acted within its discretion in resolving that dispute.

In order to find that it has specific personal jurisdiction over a defendant, a court must determine whether the cause pleaded "arose out of the contacts" the defendant had with the state. *See Beechem v. Pippin*, 686 S.W.2d 356, 361 (Tex.App.—Austin 1985, no writ). It is necessary to establish whether the defendants purposely availed themselves of the privilege of conducting activities within the forum state. *Id.* The record contains evidence that MKP and Magnolia did so when entering the contract with KEMCO.

The crux of this dispute is what the parties contracted for. According to Magnolia and MKP, the contract was for the installation of a gas plant in Arkansas. They argue that all other matters are incidental to that agreement. In what state KEMCO "chose" to do the refurbishing contemplated by the agreement and necessary for performance was of no concern to Magnolia and MKP.

KEMCO, on the other hand, argues that the contract specifically contemplated that much of the refurbishing work would be done at its plant in Jourdanton, Texas. KEMCO points to a work order attached to the contract in dispute, which states that KEMCO is to "dismantle, remove and transport all Kellyville equipment items listed in Exhibit 'D' to Contractor's [KEMCO's] yard." Since that yard is in Texas, Magnolia and MKP would thus benefit from the work of Texas employees, whose work was governed by Texas laws. Under this argument, Magnolia and MKP did purposely avail themselves of the privilege of conducting activities within Texas. According to KEMCO, the work done at its plant amounted to eighty percent of the work contemplated by the agreement.[1]

---

1. The record neither supports nor under-

mines this assertion. It is clear, however,

The majority is correct in observing that jurisdiction may not be supported by the unilateral acts of the plaintiff. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). It has been held that the purchasing of products that were constructed in Texas cannot, without more, be sufficient to support jurisdiction. *See Hydrokinetics, Inc. v. Alaska Mechanical, Inc.,* 700 F.2d 1026, 1029 (5th Cir.1983), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2180, 80 L.Ed.2d 561 (1984). Nor is mere payment on a contract in Texas by itself sufficient. *See U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760, 763 (Tex.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978). However, in this case, *both parties* performed part of their contractual duties in this state. MKP and Magnolia wired payments to accounts in this state, and KEMCO did refurbishing work here.

The contract at issue is not for the mere purchase of a product that was, incidentally, manufactured in Texas. Instead, the contract contemplates that parts be refurbished and transferred. This work is an integral part of the agreement. M & M, and then Magnolia and MKP, did not desire merely to purchase a plant or even to have one constructed for them in Arkansas. They sought the refurbishment of parts and the transfer of those parts to Arkansas *and* the construction there of a plant. KEMCO's yard is located in Texas. It is clear that the parties contemplated and purposely availed themselves of the privilege of conducting activities in Texas. The evidence presented to the trial court supports such a finding.

KEMCO officials testified that Magnolia and MKP understood where the work was to be done. George Keeney, a vice president of Okland Oil Company, the managing member of Magnolia, stated that he knew before the contract was executed that some of the work would be done in

Texas. The companies had a brochure that identified the location of KEMCO's yard and the nature of KEMCO's business. According to the affidavit of Deral Knight, chief executive officer of KEMCO, the brochure clearly states that KEMCO does its refurbishing work at its Jourdanton yard.[2] The contract itself specifies that the work will be done at the *"Contractor's* yard." No one has claimed that this language is ambiguous. The record does not reflect that KEMCO, the contractor, had any yard but the one in Jourdanton at the time this contract was entered into. The trial court could have determined that partial performance in Texas was accomplished with Magnolia's and MKP's consent. *See Castle v. Berg,* 415 S.W.2d 523, 525 (Tex. Civ.App.—Dallas 1967, no writ) (noting that although agreement didn't specify place for performance, such performance was accomplished in Texas, with appellant's consent, and this was sufficient to establish minimum contacts).

"Narrow factual distinctions will often suffice to swing the due process pendulum" in jurisdiction cases. *U–Anchor Advertising, Inc.,* 553 S.W.2d at 764. A review of the disposition of such cases in Texas suggests that this trial judge operated well within the parameters of established law in denying Magnolia's and MKP's special appearance. *See Ross F. Meriwether & Assoc., Inc. v. Aulbach,* 686 S.W.2d 730, 731 (Tex.App.—San Antonio 1985, no writ) (nonresident is subject to suit if the cause of action arises from transaction consummated in Texas and jurisdiction comports with fair play and substantial justice); *Beechem,* 686 S.W.2d at 362 (upholding jurisdiction where party sought contract in Texas by telephone and made payments in Texas); *Wright Waterproofing Co. v. Applied Polymers of Am.,* 602 S.W.2d 67, 71 (Tex.Civ.App.—Dallas 1980), *writ ref'd n.r.e.,* 608 S.W.2d 164

that some of the work was performed in Jourdanton.

2. The brochure states, "KEMCO has the capability to completely assemble and test entire plants at its facility in Jourdanton, Texas."

(corporation availed itself of Texas law by coming to state to negotiate sale of its product); *Pizza Inn, Inc. v. Lumar*, 513 S.W.2d 251, 254 (Tex.Civ.App.—Eastland 1974, writ ref'd n.r.e.) (defendant was "doing business" in Texas when it entered into contract by mail with Texas corporation and contract was to be performed, in part, in Texas); *Berg*, 415 S.W.2d at 525 (finding personal jurisdiction where contract was made in Texas and, with appellant's consent, partly performed there). That other courts have found no jurisdiction in similar cases simply illustrates what it means to leave a matter to a trial judge's discretion.

The majority acknowledges that it must assume the trial court found that both parties contemplated some part of each party's performance would occur in Texas. Despite this acknowledgment that the trial court could reasonably have reached this finding from the evidence presented, the majority concludes that Magnolia and MKP did not purposefully avail themselves of the benefits and protections of Texas law because the Texas contacts were incidental and immaterial. I find nothing incidental or immaterial in the fact that the parties contemplated that KEMCO was to perform the refurbishing work, that was an integral component of the scope of the work to be performed under the contract, in Texas. The majority substitutes its opinion regarding the nature of the work the parties contemplated being performed in Texas for that of the trial court's. That is not the proper role for this court in conducting an abuse of discretion review.

The record supports the trial court's finding that Magnolia's and MKP's contacts with Texas were sufficient to give rise to specific personal jurisdiction. The question of whether exercising such jurisdiction comports with notions of fair play and substantial justice is fairly easy. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex.1991) (where defendant has established minimum contacts, exercise of jurisdiction is only rarely unfair or unjust).

Determining whether something is "fair" or "just" is to some degree a subjective inquiry. A trial judge's determination in this area should be given great deference. The trial judge acted within his discretion in determining that jurisdiction was fair, and evidence in the record supports his conclusion.

I concede that litigation in Arkansas would be more convenient and perhaps less burdensome to the defendants. However, convenience is not the only factor to consider and should not be determinative. *See Beechem*, 686 S.W.2d at 360 (discussing problems inherent in this consideration, such as new mobility of society). If convenience to the defendant were to be dispositive, few, if any, non-resident defendants would be sued in Texas.

I disagree with the majority's contention that Texas's interest in being the forum state is "tenuous." Texas, as the majority acknowledges, has an interest in protecting its citizens from breached contracts, fraudulent conduct, and conspiracies. *See Lujan v. Sun Exploration & Prod. Co.* 798 S.W.2d 828, 833 (Tex.App.—Dallas 1990, writ denied). Those from out of state who contract with Texas corporations should not be able to avoid those protections under the pretext that they "didn't know" the contract would be performed in this state. I do not find the fact that KEMCO has been sued in Arkansas relevant to this consideration at all. Texas, of course, has no interest in providing its citizens the protections and benefits of suit in *Arkansas*. Texas's interest is in providing a convenient forum for suit in *Texas*.

Finally, I am not persuaded in this case that the interstate judicial system's interest should weigh as heavily in the balance as the majority seems to suggest. The record is unclear about the status of the suits brought in Arkansas. KEMCO asserts in its brief that the Arkansas litigation fails to include all the parties named in the Texas litigation and that the Arkansas litigation has slowed to a standstill.

The trial court was not *required* by law to consider the Arkansas litigation as dispositive to this case. *See Quiroz v. McNamara*, 585 S.W.2d 859, 864 (Tex.Civ.App.—Tyler 1979, no writ) (pendency of action in another state does not preclude assumption of jurisdiction by Texas court). It was within the trial court's discretion to weigh the factors and evidence before it. It did so, and the evidence supports the decision reached.

CONCLUSION

The majority correctly articulates the standard of review, but disregards that standard in reaching its decision. The trial court was within its discretion in resolving the factual dispute before it. I would affirm the judgment.