No. 04-99-00047-CV



TRANSPORTES AEREOS DE COAHUILA, S.A. a/k/a TACSA,


Appellant



v.



Ana Maria FALCON, et al.,


Appellees



From the 365th Judicial District Court, Maverick County, Texas


Trial Court No. 96-11-14123-CV/97-10-14819-CV


Honorable Amado J. Abascal, III, Judge Presiding



Opinion by: Phil Hardberger, Chief Justice


Sitting: Phil Hardberger, Chief Justice

 Catherine Stone, Justice

 Karen Angelini, Justice



Delivered and Filed: August 18, 1999


REVERSED AND RENDERED


 This is an accelerated appeal from a trial court's order denying the special appearance filed
by Transportes Aereos de Coahuila, S.A. a/k/a TACSA ("TACSA"). TACSA contends that the trial
court erred in denying TACSA's special appearance based upon lack of personal jurisdiction.
TACSA further asserts that it did not waive its special appearance based on the filing of an agreed
motion for new trial to set aside a default judgment. We reverse the trial court's order and render
judgment dismissing TACSA.

Factual and Procedural History


 On October 31, 1995, an aircraft leased and operated by TACSA crashed while en route from
Saltillo, Mexico to Piedras Negras, Mexico, killing eight passengers and severely injuring two
others.(1) On November 6, 1996, a lawsuit ("Falcon I") was filed on behalf of the survivors and a
portion of the surviving family members. Falcon I was removed to federal court. On October 30,
1997, a second lawsuit ("Falcon II") was filed naming additional plaintiffs and defendants. Falcon
II was also removed to federal court.

 While the lawsuits were pending in federal court, the district court ruled on a motion to
dismiss for lack of personal jurisdiction filed by TACSA. The district court initially granted the
motion but, on reconsideration, reversed itself and entered an order denying the motion to dismiss.
The order was issued simultaneously with another order remanding the case to state court for lack
of subject matter jurisdiction. The order denying the motion to dismiss was appealed to the Fifth
Circuit.(2) The Fifth Circuit noted that the district court found that personal jurisdiction existed based
on "new evidence that TACSA maintained a bank account in Texas, had correspondence concerning
the bank account sent to a mailing address within the United States, regularly repaired its aircraft in
Texas, and regularly bought supplies in Texas." The Fifth Circuit held that the district court's order
did not have any preclusive or res judicata effect because the personal jurisdiction issue could be
reviewed by the state court on remand; therefore, the Fifth Circuit dismissed the appeal.

 After remand, TACSA filed a special appearance and original answer subject to its special
appearance in Falcon I, but not in Falcon II. Subsequently, the plaintiffs moved for a default
judgment in Falcon II. Although TACSA filed a special appearance and original answer subject to
its special appearance in Falcon II prior to the date of the default judgment hearing, the trial court
entered a default judgment. After TACSA requested a hearing on its special appearance and the
hearing had been set, the parties filed an agreed motion for new trial, stating that TACSA had a
responsive pleading on file in Falcon II; therefore, the default judgment was in error. The trial court
subsequently entered an order to set aside the default judgment.

Waiver


 In its supplemental response to TACSA's special appearance, the plaintiffs asserted that
TACSA waived its special appearance based on the filing of the agreed motion for new trial.
TACSA counters that the procedural facts in this case are distinguishable from the facts in those
cases where waiver has been found. In order to resolve the waiver contention, we must first examine
the procedural facts in those cases in which waiver has been an issue.

 In Liberty Enterprises, Inc. v. Moore Transp. Co., Inc., 690 S.W.2d 570, 571 (Tex. 1985),
Moore Transportation Company sued Liberty Enterprises, Inc. for uncollected freight charges. Three
weeks after Moore secured a default judgment against Liberty, Liberty filed its special appearance
and, on the same day, a motion to set aside the default judgment and to grant a new trial. Id. The
trial court deemed Liberty's actions to constitute a general appearance and subsequently rendered
judgment in favor of Moore. Id. On appeal, the Texas Supreme Court noted that the threshold
question was whether the trial court erred in deeming Liberty's conduct a general appearance. Id.
 In determining that Liberty submitted to the trial court's jurisdiction, the Court relied on two
affirmative actions by Liberty: (1) Liberty's motion for new trial stated "Liberty is ready to try this
case when it is properly set for trial;" and (2) Liberty agreed to the court's order reinstating the cause
of action. Id. at 571-72.

 In Dawson-Austin v. Austin, 968 S.W.2d 319, 323 (Tex. 1998), cert. denied, 119 S. Ct. 795
(1999), the Court announced that the test for a general appearance is whether the party asserting the
absence of personal jurisdiction requests affirmative relief inconsistent with the assertion that the
district court lacks jurisdiction. In that case, Dawson-Austin filed an unsworn special appearance,
a motion to quash service of citation, a plea to the jurisdiction, a plea in abatement, and an original
answer in the same instrument. Id. at 321. The trial court overruled the special appearance because
it was not sworn and because the motion to quash, plea to the jurisdiction, and plea in abatement
contained in the same instrument were not expressly made subject to the special appearance. Id.
The court of appeals held that the special appearance was properly overruled because it was unsworn.
Id.

 The Texas Supreme Court reversed, noting that the lack of verification could be cured by
amendment, and, as long as the amendment was filed before a general appearance was entered, there
was no waiver. Id. at 321-22. The Court also rejected Austin's argument that the special appearance
was waived based on Dawson-Austin's motion for continuance filed on the day of the hearing on
Dawson-Austin's special appearance, motion to quash, plea to the jurisdiction, and plea in
abatement. Id. at 323. The Court noted that the motion for continuance was filed after the special
appearance and did not request affirmative relief inconsistent with Dawson-Austin's assertion that
the district court lacked jurisdiction. Id. The Court further noted that the motion was particularly
appropriate given that Austin, not Dawson-Austin, set the matters for hearing. Id.

 Although TACSA did not make the agreed motion for new trial expressly subject to its
special appearance, the facts in this case are distinguishable from Liberty Enterprises because the
agreed motion for new trial does not contain a "ready" statement. The only request made in the
prayer is that the agreed motion for new trial be granted and the interlocutory default judgment be
vacated in its entirety. TACSA never stated that it was "ready to try this case when it is properly set
for trial."

 In addition, there is no indication in our record that TACSA approved the order granting the
new trial. The order does not contain TACSA's signature approving the order. The plaintiffs assert
in their brief that TACSA drafted the agreed motion and order submitted to the trial court. However,
we are not convinced that this action alone is sufficient to waive TACSA's special appearance. The
mere filing of a motion for new trial, without a request that it be set for a hearing before the hearing
on the special appearance, is not a request for affirmative relief inconsistent with the assertion that
the district court lacks jurisdiction. See Dawson-Austin, 968 S.W.2d at 323.

 TACSA asserts that it never requested a hearing on the motion for new trial or appeared at
a hearing and presented argument relating to that motion. TACSA's special appearance was set on
October 15, 1998, for hearing on December 21, 1998. The agreed motion for new trial was filed on
November 18, 1998. The order granting the new trial was signed on December 2, 1998. TACSA
asserts in its brief that the trial court entered the order sua sponte. Although the order states that it
was entered after reviewing the motion and the argument of counsel, there is no evidence in our
record that a hearing occurred at which counsel argued the motion to the trial court, and the plaintiffs
did not refute that the order was entered sua sponte either in their brief or during the oral argument
of this case.

 The facts in this case are distinguishable from those in the Liberty Enterprises case because:
(1) the agreed motion contained no "ready" statement and was filed after the special appearance in
accordance with rule 120a; and (2) there is no evidence in our record that a hearing was held on the
motion or that TACSA approved the order granting the new trial. We conclude TACSA's actions
amounted to no more than filing a motion for new trial which is permitted under rule 120a. As a
result, TACSA did not waive its special appearance.

Special Appearance



 Standard of Review


 A nonresident defendant must negate all bases of personal jurisdiction to prevail in a special
appearance. CSR Ltd v. Link, 925 S.W.2d 591, 596 (Tex. 1996). On interlocutory appeal, we review
the granting of a special appearance for an abuse of discretion. Klenk v. Bustamante, 989 S.W.2d 56,
59 (Tex. App.--San Antonio 1998, no pet.). Under this standard, we may not disturb a trial court's
resolution of factual issues unless the trial court could reasonably have reached only one conclusion.(3)
Id. With regard to legal issues, however, we are much less deferential. Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992). A trial court has no "discretion" in determining what the law is or
applying the law to the facts of the case. Id. A clear failure by the trial court to analyze or apply the
law to the facts correctly will constitute an abuse of discretion. Id.

 Because the record lacks findings of fact and conclusions of law, all questions of fact are
presumed to support the judgment. Id. These findings are inconclusive, however, because the
appellate record contains a reporter's record. Id.


 Personal Jurisdiction Test


 A court may assert personal jurisdiction over a nonresident defendant only if the requirements
of both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and
the Texas long-arm statute are satisfied. CSR Ltd., 925 S.W.2d at 594. The Texas Supreme Court
has repeatedly interpreted the Texas long-arm statute to reach as far as the federal constitutional
requirements of due process will allow. Id. Consequently, the requirements of the Texas long-arm
statute are satisfied if the exercise of personal jurisdiction comports with federal due process
limitations. Id.

 The federal constitutional test of due process consists of two parts: (1) whether the nonresident
defendant has purposely established "minimum contacts" with the forum state; and (2) if so, whether
the exercise of jurisdiction comports with "fair play and substantial justice." Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 475-76 (1985). The minimum contacts requirement is satisfied if either
general or specific jurisdiction exists. CSR Ltd., 925 S.W.2d at 595. In this case, the plaintiffs
concede that specific jurisdiction is not applicable. Therefore, we only consider whether general
jurisdiction exists.


 General Jurisdiction


 General jurisdiction is present when a defendant's contacts are continuous and systematic,
permitting the forum to exercise personal jurisdiction over the defendant even if the cause of action
did not arise from or relate to activities conducted within the forum state. Id. General jurisdiction
requires a showing that the defendant conducted substantial activities within the forum, a more
demanding minimum contacts analysis than for specific jurisdiction. Id.

 There does not appear to be a great dispute regarding the type of contacts TACSA had with
Texas. The parties' dispute focuses more on the nature and extent of those contacts, and whether they
meet the test for general jurisdiction.

 TACSA was a Mexican corporation that operated a commercial airline service between
Mexican cities from about October of 1994, when it leased two aircraft from Western, to November
of 1995, shortly after the crash leading to the litigation for which the plaintiffs are suing TACSA.
TACSA does not have any employees in Texas and does not advertise or solicit business in Texas.
The crash occurred just outside of Piedras Negras and was investigated by Mexican authorities. The
aircraft wreckage, all of TACSA's records relating to maintenance, repair, and inspection, all records
relating to TACSA's pilots, all former employees of TACSA, and all investigative documents are
located in Mexico.

 The plaintiffs alleged that notwithstanding the foregoing, TACSA had several contacts with
Texas that were sufficient to establish general jurisdiction. The following details the contacts alleged
by the plaintiffs and the evidence presented with regard to the significance of those contacts:

 (1) TACSA purchased fuel from Labata Services in Laredo(4);

 (2) TACSA purchased parts and supplies from Barker Aeromotive in Laredo;(5)

 (3) Barker Aeromotive served as a mail-drop for parts from other vendors;(6)

 (4) TACSA took possession of the aircraft at Integrity Air in Laredo;(7)

 (5) Aircraft logs reflect that the TACSA aircraft flew to Laredo;(8)

 (6) TACSA sought a letter of credit from a Texas bank to secure the lease payments to
Western; TACSA ultimately obtained the letter of credit from a Mexican bank;


 (7) TACSA learned that Western's aircraft were available for lease through Doug Lacey,
Western's broker in Laredo;(9) and


 (8) TACSA maintained an account at Laredo National Bank, listing Barker Aeromotive
at the Laredo National Airport as its address.(10)



 Accepting that the trial court properly found that each of the foregoing contacts was
sufficiently supported by the evidence, we must now apply the law to those facts. In other words, we
must determine whether those facts, as found by the trial court, were sufficient to support general
jurisdiction. This application of the law to the facts is reviewed de novo, and the trial court's clear
failure to correctly apply the law to the facts constitutes an abuse of discretion. Walker v. Packer, 827
S.W.2d at 840.

 In Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 410 (1984), the United
States Supreme Court was called upon to decide whether Texas had general jurisdiction over a
corporation that owned a helicopter that crashed in another country, killing four United States
citizens. In that case, the Court stated that mere purchases, even if occurring at regular intervals, are
insufficient to warrant a state's assertion of jurisdiction over a nonresident corporation in a cause of
action not related to those purchase transactions. Id. at 418. The Court noted that the company's
contacts with Texas consisted of: (1) sending its chief executive officer to Houston for a contract-negotiation session; (2) accepting into its New York bank account checks drawn on a Houston bank;
(3) purchasing helicopters, equipment, and training services from Bell Helicopter for sums in excess
of $4 million; and (4) sending personnel to Bell's facilities in Fort Worth for training. Id. at 417. The
Court held that those contacts were insufficient to establish general jurisdiction. Id. at 418-19.

 Applying the law established in Helicopteros to the facts in this case, we note that the mere
purchase of fuel, parts and supplies in Laredo cannot be sufficient to warrant Texas's assertion of
jurisdiction. If the purchase of such supplies worth over $4 million in Helicopteros was insufficient,
then the purchase of a far lesser figure is equally unconvincing under the law. The infrequent use
of the Laredo National Bank account to assist in the sporadic purchases is similarly unavailing. With
regard to the few trips that were made by TACSA to retrieve parts and to take delivery of the aircraft,
we note that the number of those trips was far less than the trips taken into Texas in the Helicopteros
case and far less substantial in nature. In Helicopteros, personnel were sent to Texas for training. In
the instant case, personnel were sent to Texas once to take delivery of the aircraft and infrequently
thereafter to purchase supplies, parts and fuel.

 Applying the law established in Helicopteros to the instant case, we conclude, as a matter of
law, that the contacts which the trial court found to exist with Texas are too sporadic to rise to the
level of continuous and systematic contacts as required to satisfy the general jurisdiction requirement.


 Fair Play and Substantial Justice


 Addressing the second part of the test, the contacts with Texas must be evaluated in light of
other legal factors to determine whether a finding of personal jurisdiction comports with principles
of substantial justice and fair play. Schlobohm v. Schapiro, 784 S.W.2d 355, 358 (Tex. 1990). These
factors include: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating
the dispute; (3) the plaintiff's interest in obtaining convenient and efficient relief; (4) the interstate
judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared
interest of the several states in furthering fundamental substantive social policies. Guardian Royal
Exchange Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 228 (Tex. 1991). In
addition, the unique burdens placed upon one who must defend himself in a foreign legal system
should have significant weight in assessing the reasonableness of stretching the long arm of personal
jurisdiction across national borders. Id. at 229. Accordingly, when an international dispute is
involved, the following factors should also be considered: (1) the unique burdens placed upon the
defendant who must defend itself in a foreign legal system; and (2) the procedural and substantive
policies of other nations whose interests are affected as well as the foreign government's interest in
its foreign relation policies. Id.

 In Juarez v. United Parcel Service de Mexico S.A. de C.V., representatives of an estate
appealed the trial court's order sustaining the special appearance of United Parcel Service de Mexico,
S.A. de C.V. ("UPSM") and dismissing the lawsuit. 933 S.W.2d 281, 283 (Tex. App.--Corpus
Christi 1996, no writ). In that case, the appellants' son was struck and killed while walking across
a street in Matamoros, Mexico, by a truck owned by UPSM and being driven by one of its employees.
Id. The plaintiffs were Mexican citizens, the employee-driver was a Mexican citizen, and UPSM was
a Mexican corporation. Id. The evidence showed that UPSM was wholly owned by UPS
International, Inc. Id. at 284. Though not licensed to do business in Texas, UPSM crossed the border
some ten times a day to transfer packages at transfer points in Texas. Id. UPSM also periodically
bought and repaired its trucks in Texas. Id.

 The Corpus Christi court concluded that it may be reasonable to conclude that the daily
transfers made to Texas cities, coupled with the purchase and repair of trucks in Texas, were
sufficient to confer general jurisdiction. Id. at 285. However, the court determined that it was not
necessary to decide that issue because the second prong of the due process analysis would be violated
by an assertion of personal jurisdiction. Id. The court reasoned:

 Whether or not "minimum contacts" exist, the present dispute is wholly between
Mexican citizens, and arises out of a tragic incident which occurred wholly within
Mexico, with no asserted ties to any occurrences, instrumentalities or issues involving
the State of Texas or any of its residents. Mexico has every interest in providing a
remedy and a forum for the present dispute between its own citizens, and the State of
Texas has no substantial interest in the dispute. In addition, the burdens upon UPSM
and [the driver] are obviously significant in requiring them to defend themselves in
a foreign country concerning an incident that will involve proof of Mexican law and
evidence which must be gathered in Mexico and presented in a Texas court.
Accordingly, the present assertion of jurisdiction over UPSM and [the driver] does not
comport with traditional notions of fair play and substantial justice.


Id. at 285-86. We believe that reasoning similar to that set forth in the UPSM case is applicable in
this case. It should be noted that the plaintiffs in this case conceded that there were not sufficient
contacts to warrant the exercise of personal jurisdiction over the estate of the pilot, who was flying
TACSA's plane when it crashed. In addition, fifty-one of the plaintiffs are Mexican nationals. Only
one plaintiff asserts that he is a Texas resident, and only six others have Texas residences even though
they are domiciled in Mexico. Although the plaintiffs assert that the United States National
Transportation Safety Board and manufacturers of the aircraft frame and engine investigated the
crash, we place no greater importance on the NTSB's investigation over that conducted by its
Mexican counterpart, DGAC. It would be just as easy to translate the NTSB's report into Spanish
as to translate the DGAC's report to English. Moreover, when viewed in light of the isolated contacts
TACSA had with Texas, it would not be foreseeable to TACSA that it would be haled into Texas
courts. TACSA did not have any employees in Texas, did not fly into Texas except on a few isolated
occasions, did not advertise or solicit customers in Texas, did not repair its aircrafts in Texas, and
only occasionally purchased office supplies or spare parts in Texas.

Conclusion


 TACSA has not purposefully established "minimum contacts" with Texas. In addition, the
exercise of jurisdiction over TACSA does not comport with "fair play and substantial justice."
Because the trial court clearly failed to correctly apply the law to the facts, it abused its discretion in
denying TACSA's special appearance. We reverse the trial court's order and render judgment
dismissing TACSA from this cause for lack of personal jurisdiction.


 PHIL HARDBERGER,

 CHIEF JUSTICE


PUBLISH 








1. The aircraft was owned by Nozaki & Co., Ltd., a Japanese corporation, which leased it to Western Aircraft,
Inc., an Idaho corporation, which leased it to TACSA.
2. Falcon v. Transportes Aereos de Coahuila, S.A., 169 F.3d 309 (5th Cir. 1999).
3. This standard was adopted by this court in Klenk and subsequently applied by this court in later decisions See
Magnolia Gas Co. v. Knight Equip. & Mfg. Corp., No. 04-98-00156-CV, slip op. at 6-7, 1998 WL 652548, at * 3 (Tex.
App.--San Antonio, Sept. 23, 1998, no pet.); Jones v. Beech Aircraft Corp., No. 04-98-00983-CV, slip op. at 2 (Tex.
App.--San Antonio, May 26, 1999, pet. requested). We note that it could be argued that the proper standard of review,
even with respect to factual issues, should be de novo, particularly in cases in which the trial court had the same record
to review as is presented to this court, i.e., no live testimony was introduced at the hearing which would place the trial
court in a better position to evaluate credibility. Because we believe the outcome in this case would not be affected by
a change in the standard of review, and since the parties did not assert that the de novo standard is more appropriate,
we do not reconsider the proper standard of review at this time.
4. The record contains the affidavit of Doug Lacey, who owns Labata and is one of its officers. Lacey states
that only three invoices documenting sales to TACSA could be located for purchases in August of 1995 ($41.01 - oil),
September of 1995 ($246.24 - oil), and December of 1995 ($97.20 - fuel). The record also contains a statement dated
February 28, 1995 from Labata referencing two additional invoices for charges incurred by TACSA in February of 1995
for $861.12 and $233.10, respectively. The invoice for $231.20 references tail # XARUH and may not be for a TACSA
aircraft. Alberto Gonzalez King, general director of TACSA, testified that charges for Servicios Aereos Ejecutivos De
La Laguna S.A. de C.V., another company for which he served as general director, were sometimes charged to TACSA's
account because the company responsible for payment would be confused. Gonzalez testified that he and his secretary
would later determine which company was responsible for the charges. The February statement also reflects a balance
forward of $2,435.31. The ending balance on the February statement is $3,529. The record also contains a statement
dated December 25, 1994. That statement reflects a balance forward of $324. It further reflects three invoices for
purchases on November 12, 1994 ($61.24), November 29, 1994 ($5,000), and December 7, 1994 ($88.00). The invoice
for $88.00 references tail # X8FHB and may not be for a TACSA aircraft. The balance at the end of the statement is the
$2,435, which is reflected as a balance forward on the February 1995 statement. Three checks were written on TACSA's
Laredo National Bank account payable to Labata: (1) check # 170 - Feb. 2, 1996 - $3,041.53; (2) check $204 - July 10,
1996 - $1,790.04; and (3) check #208 - July 10, 1996 - $155.28, references XO-RLH. Each of these checks were written
after TACSA ceased its operations.
5. The record contains the affidavit of Wayne Barker, owner and operator of Barker Aeromotive. Barker states
that Barker Aeromotive only sold parts to TACSA and did not conduct any repair services. Barker located three invoices
relating to parts sold to TACSA on October 27, 1994 ($240.20), March 15, 1995 ($2,281.49), and March 31, 1995
($1,201.09). The record also contains an additional invoice for approximately $502 dated in April of 1995. Several
checks were written on TACSA's Laredo National Bank account payable to Barker: (1) check to Wayne Barker for
$15.32 on June 21, 1995 - Gonzalez testified that this was for a book of stamps, some of which were used for TACSA
business; (2) check #107 - October 4, 1995 - $1,000, Gonzalez testified that the payment was for amounts owed by either
TACSA or Servicios; (3) check # 171 - February 2, 1996 - $5,228; and (4) check #210 - July 11, 1996 - $5,000 -
reflecting payment on the Servicios account.
6. Wayne Barker's affidavit states that he received a small amount of mail and packages, mainly spare parts,
for TACSA at his address at Laredo National Airport. The record also contains a packing slip and invoice reflecting one
such shipment from Western to TACSA. Gonzalez testified that he had some parts shipped to Barker's address because
some of the closer Mexican airports did not have a customs broker necessary for the import of the parts.
7. The record contains the delivery receipt signed on TACSA's behalf in Laredo. Western Aircraft's
representative stated in his deposition that delivery was in Laredo at TACSA's request. Gonzalez testified that a few
problems had to be worked out before Western would permit delivery, including insurance coverage and a letter of credit
to secure the lease payments.
8. The aircraft logs and Gonzalez's testimony reflect that the aircraft that crashed was flown to Laredo on August
27, 1995 and on September 7, 1995. Gonzalez could not recall the reason the aircraft went to Laredo; he assumed it was
to pick up parts. The other aircraft leased by TACSA flew to Laredo on September 1, 1995.
9. Gonzalez testified that he also knew the planes were available through people who represent Cessna in
Chihuahua. Doug Lacey met with Gonzalez in Idaho to assist in negotiating the lease. Gonzalez testified that he was
unaware that Lacey was to receive a commission from Western. Lacey confirms this in his affidavit. Gonzalez testified
that he asked Lacey to accompany him due to Lacey's experience in assessing the condition of aircraft.
10. A total of 118 checks were written on the account. Gonzalez testified that 95% of the checks were written
for personal business or business relating to Servicios. Gonzalez testified that he opened the account because many
United States businesses would not accept checks drawn on a Mexican bank. Gonzalez testified that he used the TACSA
account because he did not have a personal account or a dollar account for Servicios. A review of the checks reveals
that many were written for personal business or Servicios business. A few were written for office supplies, which
Gonzalez admitted could have been used by either TACSA or Servicios. Three or four checks were written to pay
employee salaries after TACSA ceased doing business and there was not enough money in the Mexican account. Two
checks were written to pay medical expenses of the individuals who were injured in the crash. The application for the
account reflects Barker Aeromotive as a c/o address, and TACSA's permanent address is listed in Mexico.