TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-99-00116-CV







TeleVentures, Inc., Appellant



v.



International Game Technology and IGT, Appellees








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. 98-03071, HONORABLE ERNEST C. GARCIA, JUDGE PRESIDING








 This is an appeal arising from the district court's sustaining appellees' special
appearance. (1) The sole issue on appeal is whether Texas courts can assert in personam jurisdiction
over a Nevada corporation in a suit concerning termination of its relationship with a Texas
corporation. Appellees International Game Technology and IGT specially appeared challenging
the district court's personal jurisdiction. The district court sustained their special appearance and
dismissed appellant TeleVentures, Inc.'s suit for want of jurisdiction. We will affirm.

BACKGROUND

 In early 1995, Chris Tyson, the president and principal owner of TeleVentures,
Inc. ("TeleVentures"), contacted IGT, a manufacturer of slot machines, to discuss his concept for
"in-room gaming." (2) Tyson's first contact with IGT was by telephone from Tyson's office in
Texas to IGT's office in Reno, Nevada. Tyson followed his call with a personal visit to IGT's
Reno office. IGT is a Nevada corporation with its principal place of business in Nevada. It
neither does business nor is authorized to do business in Texas. It has no agents, offices, or
property in Texas and is not a party to any contract requiring acts to be performed in Texas. IGT
has not directly hired any employees in Texas nor has it asked others such as TeleVentures to hire
employees in Texas. The same is true of IGT's parent corporation, International Game
Technology. (3) Ultimately, TeleVentures and IGT signed two letters of intent. At the time the
letters of intent were signed, TeleVentures was a Texas corporation with its principal place of
business in Austin. (4)

 After IGT expressed an initial interest in the in-room gaming concept, other
meetings followed, always in Nevada. IGT and TeleVentures concluded that there were two ways
to connect hotel televisions to IGT's gaming technology. Tyson had previously developed one
of these alternatives with the assistance of U.S. West Marketing Resources Group Inc. ("U.S.
West"), a Colorado corporation. The process consisted of attaching an IGT game board to a U.S.
West switch, which would in turn be attached to an On Command Video ("OCV") switch. (5) The
second concept, developed by IGT during its relationship with TeleVentures, involved directly
attaching an IGT game board to an OCV switch, thus eliminating the need for the intermediate
use of the U.S. West switch.

 U.S. West demonstrated its technology to IGT and TeleVentures at its offices in
Colorado in September 1995. While in Colorado, IGT and TeleVentures signed the first of two
letters of intent. The letter provided that IGT and TeleVentures would develop an in-room
gaming system; the two would "work together using their best efforts to develop and install the
System by combining the existing and future technology and equipment of TeleVentures with the
existing and future technology of IGT"; they would "mutually agree upon a hotel property
designated as a test location in which to install and evaluate the performance of the system"; the
test would be conducted and the results evaluated; and if both agreed that those results were
satisfactory, they would enter into a formal agreement to develop, market, or install the system
on a commercial basis. Following the September letter, IGT and TeleVentures signed the second
letter of intent "wherein a mutually beneficial business relationship is contemplated between
Hospitality Network, Ltd., a Texas limited partnership, (6) and a newly formed partnership [to be
called Game Ventures] consisting of IGT, a Nevada corporation ("IGT") and TeleVentures, Inc.,
a Texas corporation." This letter was prepared by TeleVentures in its Austin office and mailed
to Nevada, where it was signed by IGT.

 After considering the two alternatives for linking IGT's devices to hotel room
television sets, IGT decided, for reasons of cost, convenience, and security, that the direct-
attachment system was the better choice. IGT made this decision after the first few meetings with
TeleVentures but continued to work with TeleVentures because TeleVentures had "the concept"
of in-room gaming, "an understanding of in-room television," and a personal connection with
Hospitality Network, which had a "good understanding of in-room television in the hotel
business."

 Although IGT had anticipated that some of the technology and equipment for the
concept would be provided by TeleVentures, IGT's decision not to use the U.S. West system
resulted in IGT's dealing directly with OCV because for reasons not indicated in the record, OCV
refused to work with TeleVentures. Additionally, IGT did not share any information regarding
its gaming technology with TeleVentures. As a result, TeleVentures did not contribute further
to the development of the direct-attachment system. However, TeleVentures, on its own
initiative, began to explore a third alternative, the "game cube," that could be used in hotels not
wired with the OCV system. IGT was aware of TeleVentures' work but never incorporated the
game cube into its development plans.

 During their relationship, IGT and TeleVentures communicated via personal visits,
facsimiles, letters, and telephone calls. TeleVentures' employees traveled to Nevada; however,
no IGT employees or representatives came to Texas. The record reflects at least seventy written
communications to and from Texas consisting of development updates, travel arrangements,
meeting schedules, and even a Christmas card. Decisions regarding how the project was to move
forward were made during the calls, visits, and written communications. TeleVentures prepared
and forwarded a proposed draft of a partnership and operating agreement to IGT in Nevada, but
IGT never signed them.

 TeleVentures established offices and a payroll in Austin, Texas, and created several
marketing devices: (1) a study of potential test sites and marketplaces for the system; (2) an
updated business plan introducing the name "CasinoVision"; (3) brochures, a logo, and other
marketing material to promote "CasinoVision"; and (4) at IGT's request, a "Business Summary." 
TeleVentures asked IGT for a videotape that TeleVentures could implant onto a CD ROM, which
could be used to demonstrate "hotel in-room gaming using a remote control like in a hotel room." 
All TeleVentures' activities were performed in Texas.

 In March 1996, IGT connected one of its gaming boards to an OCV switch and
conducted a mini-demonstration in Nevada. IGT and TeleVentures also planned to travel to
Aruba to conduct a hotel test of the in-room gaming system. The trip never occurred, and in June
1996, IGT announced its decision to discontinue pursuing the idea of in-room gaming with
TeleVentures. The parties attempted to rework their arrangement, but the effort was abandoned
on January 9, 1997 when IGT sent a final letter unilaterally terminating any relations with
TeleVentures (the "termination letter").

 TeleVentures filed this suit against IGT accusing IGT of breach of contract, breach
of fiduciary duties, fraud in the inducement of the letters of intent, fraudulent concealment,
negligent misrepresentation, and tortious interference. IGT specially appeared challenging the
district court's personal jurisdiction. See Tex. R. Civ. P. 120a. The district court sustained
IGT's challenge. TeleVentures appeals.


DISCUSSION

 In its sole issue on appeal, TeleVentures claims that the district court erred in
sustaining IGT's special appearance and dismissing the suit for lack of in personam jurisdiction
because: (1) IGT purposefully directed activities into Texas; (2) this lawsuit arises from and
relates directly to such activities and torts committed in this state; and (3) the district court's
exercise of jurisdiction over IGT does not offend traditional notions of fair play and substantial
justice. TeleVentures argues that IGT entered into a contract with a Texas corporation knowing
that the majority of TeleVentures' work was to be done in Texas, and through IGT's constant
contact with TeleVentures by phone calls, letters, facsimiles, and personal visits, IGT was aware
of and approved the work done in Texas. TeleVentures also argues that IGT, through
TeleVentures, recruited Texas residents located in Texas for performance of their joint objectives. 
TeleVentures further asserts that its causes of action, which include breach of contract, breach of
fiduciary duties, fraud in the inducement, fraudulent concealment, negligent misrepresentation,
and tortious interference arise from and are related to IGT's contacts with Texas because: (1) the
breach of contract and breach of fiduciary duties involve a contract that was to be partially
performed in Texas; (2) the breach of contract, breach of fiduciary duties, fraud in the
inducement, fraudulent concealment, negligent misrepresentation, and tortious interference
occurred in Texas when IGT sent the termination letter to TeleVentures in Texas; and (3) the
causes of action for fraud in the inducement, negligent misrepresentation, and tortious interference
are based, in part, upon statements IGT made in communications to TeleVentures in Texas with
the intent of inducing TeleVentures to enter into the two letters of intent. Finally, TeleVentures
asserts that the assumption of jurisdiction in Texas does not offend notions of fair play and
substantial justice because IGT is a multi-million dollar conglomerate that does business
throughout the world. Thus, litigation in Texas would not be excessively burdensome to IGT,
in contrast to the burden that litigation in Nevada would impose on TeleVentures, a start-up
company with little or no revenue.


Burden of Proof and Standard of Review

 In interposing a special appearance, the nonresident defendant challenging personal
jurisdiction bears the burden of proof to negate all bases of personal jurisdiction alleged by the
plaintiff. See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d
223, 231 n.13 (Tex. 1991) (citing Zac Smith & Co. v. Otis Elevator Co., 734 S.W.2d 662, 664
(Tex. 1987); Siskind v. Villa Found. for Educ., Inc. 642 S.W.2d 434, 438 (Tex. 1982)); 
Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 203 (Tex. 1985).

 The district court filed findings of fact and a conclusion of law. (7)
 See Tex. R. Civ.
P. 296-297. TeleVentures asserts that the "findings of fact are not findings at all, but rather, legal
conclusions." The parties do not dispute the material facts before the district court in any
significant degree. We agree with TeleVentures that the district court's "findings" and
"conclusion" are, in actuality, all conclusions of law and we will consider them as such. We
review the trial court's conclusions of law de novo. See Piazza v. City of Granger, 909 S.W.2d
529, 532 (Tex. App.--Austin 1995, no writ). Conclusions of law will not be reversed unless they
are erroneous as a matter of law. See id. (citing Westech Eng'g, Inc. v. Clearwater Constructors,
Inc., 835 S.W.2d 190, 196 (Tex. App.--Austin 1992, no writ)).


Jurisdiction

 A Texas court may exercise personal jurisdiction over a nonresident defendant if:
(1) jurisdiction is authorized by the Texas long-arm statute, (8) and (2) the exercise of jurisdiction
is consistent with federal and state due process standards. See Guardian Royal, 815 S.W.2d at
226; Transportacion Especial Autorizada, S.A. v. Seguros Comercial America, S.A., 978 S.W.2d
716, 719 (Tex. App.--Austin 1998, no pet.). The long-arm statute allows Texas courts jurisdiction
to the full extent permitted by the United States Constitution. See Guardian Royal, 815 S.W.2d
at 226. Thus, the only limitations on Texas courts in asserting personal jurisdiction over a
nonresident defendant are those imposed by the Due Process Clause of the Fourteenth
Amendment. See Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 413-14 (1984). 
Due process requires a showing that the nonresident defendant has purposefully established
"minimum contacts" with Texas and that the maintenance of the suit does not offend "traditional
notions of fair play and substantial justice." See International Shoe Co. v. Washington, 326 U.S.
310, 316 (1945); Guardian Royal, 815 S.W.2d at 230-31.

 Although the jurisdiction of Texas courts is always dependent on the defendant's
having some minimum contacts with Texas, the requisite extent of those contacts varies depending
on the type of in personam jurisdiction sought to be imposed. Thus, the United States Supreme
Court has refined the minimum-contacts analysis into specific and general jurisdiction. See
Guardian Royal, 815 S.W.2d at 227 (citing Helicopteros, 466 U.S. at 414-16).

 To establish specific jurisdiction, the cause of action must arise out of or relate to
the nonresident defendant's contact with the forum state and the conduct must have resulted from
that defendant's purposeful conduct, not the unilateral conduct of the plaintiff or others. See id.
(citing Helicopteros, 466 U.S. at 414 n.8, 417; World-Wide Volkswagen Corp. v. Woodson, 444
U.S. 286, 293-94, 298 (1980)). "Furthermore, the nonresident defendant's activities must have
been 'purposefully directed' to the forum and the litigation must result from alleged injuries that
'arise out of or relate to' those activities." Id. at 228 (citing Burger King Corp. v. Rudzewicz,
471 U.S. 462, 472 (1985); Zac Smith & Co., 734 S.W.2d at 663). Thus, in analyzing minimum
contacts for purposes of Texas courts' specific jurisdiction, we focus on the relationship among
the nonresident defendant, the forum, and the litigation. See id. (citing Helicopteros, 466 U.S.
at 414; Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990)).

 An assertion of general jurisdiction compels a more demanding minimum-contacts
analysis and requires a showing of substantial activities within the forum state. See id. (citing
Schlobohm, 784 S.W.2d at 357). The cause of action need not arise from or relate to the
nonresident defendant's purposeful conduct within the forum state, but there must be "continuous
and systematic contacts" between the nonresident defendant and the forum state. See id. (citing
Helicopteros, 466 U.S. at 414-16; Schlobohm, 784 S.W.2d at 357). In the present case, the
parties agree that the district court does not have general jurisdiction over IGT; therefore, we will
address only specific jurisdiction.

 To ensure compliance with the federal constitutional requirements of due process,
the Texas Supreme Court has developed what it terms a "formula" for determining jurisdiction. 
See generally Guardian Royal, 815 S.W.2d at 229-31. (9) Initially, the nonresident defendant must
have purposefully established minimum contacts with Texas, and when, as here, specific
jurisdiction is asserted, the cause of action must arise out of or relate to these contacts. See id.
at 230. Also, the action or conduct of the nonresident defendant purposefully directed toward
Texas must give rise to a "substantial connection between" Texas and the nonresident. See id. 
Second, the assumption of jurisdiction by Texas must comport with fair play and substantial
justice. See id. at 230-31 (citing Burger King, 471 U.S. at 477; Zac Smith & Co., 734 S.W.2d
at 664).


Minimum Contacts

 We must first decide whether TeleVentures' causes of action arise out of or relate
to IGT's contacts with Texas. The nonresident defendant must have purposely availed itself of
the privilege of conducting activities within the forum state, thus invoking the benefits and
protection of its laws. See Burger King, 471 U.S. at 474-75. The purposeful-availment
requirement ensures that a nonresident defendant will not be haled into a foreign jurisdiction based
solely on random, fortuitous, or attenuated contacts or unilateral activity of another party or a
third person. See id. at 475. A nonresident defendant must have fair warning that a particular
activity may subject it to the jurisdiction of a foreign sovereign. See id. at 472. Isolated contacts
with the forum state or its residents are not sufficient for a court to assume personal jurisdiction
over a nonresident defendant. See id. at 475. In assessing IGT's contacts with Texas, we will
look first to the letters of intent.


Letters of Intent

 TeleVentures argues that personal jurisdiction is established because its suit
concerns agreements (the letters of intent) made between TeleVentures, a Texas corporation, and
IGT that were to be partially performed in Texas. However, merely contracting with a Texas
corporation does not satisfy the minimum-contacts requirement. See Burger King, 471 U.S. at
478; Magnolia Gas Co. v. Knight Equip. & Mfg. Corp., 994 S.W.2d 684, 691 (Tex. App.--San
Antonio 1998, no pet.). Instead, courts must apply a "highly realistic" approach that recognizes
that a "contract . . . [is] ordinarily but an intermediate step serving to tie up prior business
negotiations with future consequences which themselves are the real object of the business
transaction." Burger King, 471 U.S. at 478. Prior negotiations, contemplated future
consequences, the terms of the contract, and the parties' actual course of dealing must be
evaluated in determining whether the defendant purposefully established minimum contacts within
the forum. See id. at 478-79. Likewise, partial performance of a contract in Texas is "not the
sine qua non of personal jurisdiction." Magnolia Gas Co., 994 S.W.2d at 692; see also U-Anchor Advertising, Inc. v. Burt, 553 S.W.2d 760, 763 (Tex. 1977) (finding no personal
jurisdiction even though plaintiff's cause of action was connected with contractual obligations that
were partially performable in Texas).

 The crux of both letters of intent is the agreement by TeleVentures and IGT to
develop an "in-room gaming system." The first letter refers only to TeleVentures and IGT. The
second letter refers to "a newly formed partnership" between TeleVentures and IGT that "shall
be called 'Game Ventures'" and will establish a "beneficial business relationship" with Hospitality
Network. The system to be developed by TeleVentures and IGT, as Game Ventures, is the same
as referenced in the earlier letter. Neither letter indicates a place of performance nor gives any
guidance with regard to the state in which either TeleVentures or IGT will perform any obligation
arising from the letters. The second letter does not disclose the state in which the new Game
Ventures partnership is to be formed or domiciled. IGT acknowledges that it anticipated
TeleVentures would contribute to the technological development of the system. However, once
the decision was made to use the direct attachment system, TeleVentures did not participate in the
further development of that system for two reasons: (1) OCV would not participate if
TeleVentures was present at any discussions between itself and IGT; and (2) IGT did not give
TeleVentures its gaming board information, which was necessary to develop the in-room gaming
system. As a result, TeleVentures' contributions were limited to its unilateral decisions to develop
the game cube and various marketing tools.

 Although IGT had knowledge of the game cube, IGT neither required nor requested
it. IGT had decided to use the direct-attachment system. In addition, IGT did not use the game
cube. The focus of the analysis must be on the actions of IGT, not TeleVentures, and the contacts
that give rise to jurisdiction must come from IGT's purposeful conduct, not the one-sided activity
of TeleVentures. See Helicopteros, 466 U.S. at 417; World-Wide Volkswagen, 444 U.S. at 292. 
TeleVentures' independent action in developing the game cube is not sufficient to confer
jurisdiction over IGT. See Barnstone v. Congregation Am. Echad, 574 F.2d 286, 288-89 (5th
Cir. 1978) (dismissing case for lack of jurisdiction because contract with Texas architect to design
and oversee construction of synagogue was wholly performable in Maine, negotiations took place
through mail, and only connection with Texas was unilateral activity of architect in preparing
sketches for building at architect's office in Texas). For the most part, TeleVentures' act of
developing various marketing tools was also unilateral. While a "Business Summary" was
prepared at IGT's request, such request does not establish jurisdiction. According to Tyson, the
business summary was designed to serve as a marketing tool and to solicit and attract interest from
third-party investors. The letters of intent each contemplate that a subsequent agreement
regarding marketing would be prepared after successful testing of the in-room gaming system. 
The preparation of the business summary was no more than a part of the ongoing communications
between TeleVentures and IGT and was not required by either letter agreement. See Magnolia
Gas Co., 994 S.W.2d at 692 (no minimum contacts where defendant "neither required nor
bargained for" work to be done in Texas). Simply asking TeleVentures to produce a business
summary does not establish a "substantial connection" between IGT and Texas. See Guardian
Royal, 815 S.W.2d at 230 (requiring substantial connection between non-resident and forum
state).

 The unexecuted proposed formal partnership agreement prepared by TeleVentures
provided for performance in Nevada. TeleVentures changed its state of incorporation from Texas
to Nevada during its relationship with IGT. The terms of the letters of intent and the history of
the parties' negotiations do not reveal purposeful conduct by IGT sufficient to subject it to the
jurisdiction of the Texas district court.


Numerous Contacts & Recruiting Texas Employees

 TeleVentures argues that the numerous and repeated contacts between it and IGT
by telephone, mail, and facsimile establish the requisite minimum contacts by IGT. In a
minimum-contacts analysis, it is not the number, but rather the quality and nature of the
nonresident's contacts with Texas that are important. See Guardian Royal, 815 S.W.2d at 230
n.11 (citing Texas Commerce Bank v. Interpol '80 Ltd., 703 S.W.2d 765, 772 (Tex. App.--Corpus
Christi 1985, no writ)); Memorial Hosp. Sys. v. Fisher Ins., 835 S.W.2d 645, 650 (Tex.
App.--Houston [14th Dist.] 1992, no writ). After reviewing the communications between the
parties contained in the record, we conclude that they are not sufficiently related to the cause of
action. They consist for the most part of development updates and travel arrangements. While
IGT admits that decisions regarding the project were made while in communication with
TeleVentures, these contacts are insufficient to establish in personam jurisdiction. Minimum
contacts may not be satisfied by merely engaging in communications with a Texas corporation
during performance of a contract. See Magnolia Gas Co., 994 S.W.2d at 691 (citing Gundle
Lining Constr. Corp. v. Adams County Asphalt, Inc., 85 F.3d 201, 205-08 (5th Cir. 1996)). The
exchange of communications between TeleVentures and IGT in the course of developing and
carrying out the contract is in itself insufficient to constitute purposeful availment of the benefits
and protections of Texas law. See Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 (5th Cir.
1986) (citing Patterson v. Dietze, Inc., 764 F.2d 1145, 1147 (5th Cir.1985)) (numerous telephone
calls from defendant to forum during course of performance insufficient to support specific
jurisdiction).

 TeleVentures also posits that Texas has jurisdiction over IGT because the
termination letter, which it argues breached the agreement created by the letters of intent, was sent
into Texas from without the state. TeleVentures cites no authority for this proposition. The
breach, if any, was not created by the termination letter; rather, if there was a breach, it occurred
when and where IGT ceased its performance of the contract. See Methodist Hosps. v. Corporate
Communicators, Inc., 806 S.W.2d 879, 882 (Tex. App.--Dallas 1991, writ denied) (breach of
contract occurs when party fails or refuses to perform); see also Restatement (Second) of
Contracts § 235(2) (when performance is due, any non-performance is breach). The termination
letter gives TeleVentures notice that IGT will no longer pursue the concept of in-room gaming and
will proceed no further with TeleVentures. Considering that (1) contracting with a Texas resident
is not enough to confer jurisdiction; (10) and (2) communications between the resident and non-resident during performance of a contract will not confer jurisdiction, (11) we hold that the mailing
of a notice that IGT will no longer pursue in-room gaming is likewise not sufficient to establish
jurisdiction.

 TeleVentures' argument that IGT recruited Texas residents for employment is not
substantiated by the record. The fact that TeleVentures hired employees to help it develop the in-room gaming concept does not satisfy the long-arm statute condition that IGT recruit Texas
residents through an intermediary located in Texas. See Tex. Civ. Prac. & Rem. Code § 17.042.


Tortious Acts

 TeleVentures argues that IGT's alleged fraudulent and negligent misrepresentations
made by way of phone calls, letters, and facsimiles constitute tortious acts committed by IGT in
Texas. TeleVentures directs us to the decisions of several state and federal courts to support its
position. We do not find these cases persuasive. In each, the communication itself was the
specific conduct that constituted the tortious act. In Calder v. Jones, 465 U.S. 783 (1984), the
National Enquirer published an allegedly libelous story concerning the California activities of a
California resident. See 465 U.S. at 784-85. The defendants were Florida residents, one a
reporter for and the other the president of the Enquirer. See id. at 785-86. Most of the research
and writing of the article was done in Florida. See id. at 785. The Calder court held that the
defendants, who between them wrote and edited the article, could anticipate being haled into a
California court when the article was published, as California was the state in which the subject
of the article resided and where the Enquirer had its largest circulation. See id. at 789-90. The
article itself was the basis of the injury and the cause of action.

 McGee v. International Life Insurance Co., 355 U.S. 220 (1957), involved the
mailing of a reinsurance certificate to a California resident, Franklin, by a Texas insurance
company. See 355 U.S. at 221. The certificate was an offer by the Texas company to insure
Franklin in accordance with an insurance contract Franklin held with an Arizona insurance
company whose insurance obligations had been assumed by the Texas company. See id. Franklin
accepted the offer and from then until his death mailed premiums from California to Texas. See
id. at 221-22. California jurisdiction was proper because the contract itself had a substantial
connection with that state and California had "a manifest interest in providing effective means of
redress for its residents when their insurers refuse to pay claims." Id. at 223. That "manifest
interest" is largely a creature of regulatory law and is not applicable to the facts before us. (12)

 Rowland & Rowland v. Texas Employers Indemnity Co., 973 S.W.2d 432 (Tex.
App.--Austin 1998, no pet.), centered on a single letter written by the nonresident defendant, a
Tennessee law firm, to the plaintiff, a Texas indemnity company. See 973 S.W.2d at 434. The
Texas company, relying on representations in the letter that the Tennessee firm would protect its
interest in a wrongful death suit pending in Tennessee, did not intervene in the Tennessee
litigation. See id. At the conclusion of the suit, the law firm distributed the entire recovery to
the wrongful death claimants to the exclusion of the Texas company, which then sued the
Tennessee firm in Texas for negligent misrepresentation. See id. Texas jurisdiction was upheld
on two bases: the letter itself constituted a purposeful contact directed to Texas with the intent that
its representations be relied upon, and the Tennessee law firm unilaterally decided to distribute
all of the proceeds to the wrongful death claimants and their lawyers, all of whom were residents
of Texas. See id. at 435-36.

 In Memorial Hospital System v. Fisher Insurance Agency, Inc., 835 S.W.2d 645
(Tex. App.--Houston [14th Dist.] 1992, no writ), the plaintiff hospital telephoned the defendant,
a Mississippi insurance agency, to verify workers' compensation insurance coverage prior to
admitting an injured worker. See 835 S.W.2d at 648. Relying on the Mississippi agency's
affirmative response, the hospital admitted and treated the worker. See id. When it discovered
that there was in fact no coverage, the hospital brought suit in Texas against the Mississippi
agency. See id. The court of appeals affirmed jurisdiction in Texas because the specific
representation in the call was relied upon in Texas. See id. Both Rowland & Rowland and
Memorial Hospital System demonstrate allegedly tortious conduct in a specific communication
intended to be relied upon within the state of Texas. While TeleVentures directs us to a quantity
of communications between it and IGT, it fails to point to any specific representation that
constitutes an allegedly tortious act, as distinguished from general, ongoing communications
during the performance of a contract. See Guardian Royal, 815 S.W.2d at 230 n.11 (quality, not
quantity, determines sufficiency of nonresident's contacts with Texas); Magnolia Gas Co., 994
S.W.2d at 691 (minimum contacts not satisfied by merely engaging in communications during
performance of contract).

 Finally, in Brown v. Flowers Industries, Inc., 688 F.2d 328 (5th Cir. 1982), Brown
alleged that he lost the chance to obtain a loan because of a defamatory statement made in a
telephone call made by Karlis, an Indiana resident, from his office in Indiana to the United States
Attorney in Mississippi. See 688 F.2d at 330-31. The Mississippi court had jurisdiction over
Karlis because, in the specific call initiated by Karlis, he allegedly committed an intentional tort,
the injurious effect of which was felt in Mississippi and was foreseeable at the time of the call. 
See id. at 334.

 In the record before us, we find no communication by IGT directed to and intended
to be relied upon by TeleVentures in Texas that, if false, gives rise to any cause of action alleged
by TeleVentures.


CONCLUSION

 We hold that IGT did not conduct purposeful activities in Texas in its dealings with
TeleVentures. The record reveals much activity in Texas by TeleVentures but no activity of
substance by IGT. IGT's Texas contacts were incidental and immaterial to the purpose of the
contract, the development of an in-room gaming system, and were not instigated by IGT. We
overrule TeleVentures' issue. (13)

 We hold that the district court properly found it could not exercise in personam
jurisdiction over IGT and affirm the district court's order sustaining IGT's special appearance and
dismissing TeleVentures' suit for lack of personal jurisdiction.



 


 Lee Yeakel, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed

Filed: February 25, 2000

Publish

1. In its brief, TeleVentures states that it is appealing pursuant to Tex. Civ. Prac. & Rem.
Code Ann. § 51.014(a)(7) (West Supp. 2000) (appeal may be brought from interlocutory order
granting or denying special appearance). However, the district court's "Order" dismisses the
entire case: "IT IS . . . ORDERED by the Court that [appellees'] special appearance motion is
hereby sustained, and that this cause is dismissed for want of jurisdiction with prejudice for
refiling same in Texas." We will address the appeal as one from a final order of the district court.
2. For purposes of this case, "in-room gaming" is a concept where a hotel guest would be
able to gamble and play games such as blackjack, slots, or poker on the television set in the
guest's hotel room.
3. This suit arises from IGT's dealings with TeleVentures. International Game Technology
was sued on alter ego theories based on its relationship with IGT. Their interests do not diverge. 
We will refer to appellees jointly as "IGT."
4. During the events preceding this suit, TeleVentures merged with a Nevada corporation
of the same name. TeleVentures thus became a Nevada corporation but maintained its principal
place of business in Austin, Texas.
5. On Command Video is a California corporation that IGT testified could bring "secure
and undistorted data from IGT's devices to hotel rooms."
6. Hospitality Network, Ltd. is a provider of interactive hotel television services.
7. The district court made five "findings of fact":


1. Neither IGT nor International Game Technology have maintained
continuous or systematic contacts with the State of Texas;


2. The liability of IGT and International Game Technology alleged by
[TeleVentures] does not arise from, nor is it related to, activity by those
companies conducted in Texas;


3. The injuries alleged in [TeleVentures'] pleadings do no[t] arise from, nor
are they related to, activities of IGT or International Game Technology
purposefully directed to the State of Texas;


4. The contact[s] of IGT and International Game Technology with the State
of Texas were minimal and fortuitous and not a result of their purposefully
conducted activities with the State of Texas; and


5. The exercise of personal jurisdiction over IGT [and] International Game
Technology in the State of Texas would not comport with traditional
notions of fair play and substantial justice;


and one "conclusion of law":


 The courts of the State of Texas may not, consistent with the Constitution
of the United States, exercise personal jurisdiction over IGT and International
Game Technology.


8. See Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041-.045 (West 1997). The long-arm
statute provides a non-exclusive enumeration of acts by a nonresident that constitute doing
business in Texas: "(1) contract[ing] by mail or otherwise with a Texas resident and either party
is to perform the contract in whole or in part in [Texas]; (2) commit[ting] a tort in whole or in
part in [Texas]; or (3) recruit[ing] Texas residents, directly or through an intermediary located
in [Texas], for employment inside or outside of [Texas]." Id. § 17.042; see also Guardian Royal
Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991);
Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990). 
9. This formula was first expressed by the supreme court in O'Brien v. Lanpar Co., 399
S.W.2d 340 (Tex. 1966), when the court adopted the Washington Supreme Court's articulation
in Tyee Construction Co. v. Dulien Steel Products, Inc., 381 P.2d 245 (Wash. 1963). The
formula has been reviewed and modified as the United States Supreme Court has examined,
developed, and refined the permissible reach of federal due process. See Guardian Royal, 815
S.W.2d at 230; Schlobohm, 784 S.W.2d at 358. 
10. See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985).
11. See, e.g., Magnolia Gas Co., 994 S.W.2d at 691.
12. The Texas Supreme Court has specifically discussed McGee in such a context. See
Guardian Royal, 815 S.W.2d at 229 n.8.
13. Because we hold that IGT did not have the requisite minimum contacts with Texas to
be subject to the jurisdiction of the district court, we need not address the second inquiry of the
jurisdictional formula--whether the assertion of personal jurisdiction would comport with fair play
and substantial justice. See Guardian Royal, 815 S.W.2d at 231.


e will address the appeal as one from a final order of the district court.
2. For purposes of this case, "in-room gaming" is a concept where a hotel guest would be
able to gamble and play games such as blackjack, slots, or poker on the television set in the
guest's hotel room.
3. This suit arises from IGT's dealings with TeleVentures. International Game Technology
was sued on alter ego theories based on its relationship with IGT. Their interests do not diverge. 
We will refer to appellees jointly as "IGT."
4. During the events preceding this suit, TeleVentures merged with a Nevada corporation
of the same name. TeleVentures thus became a Nevada corporation but maintained its principal
place of business in Austin, Texas.
5. On Command Video is a California corporation that IGT testified could bring "secure
and undistorted data from IGT's devices to hotel rooms."
6. Hospitality Network, Ltd. is a provider of interactive hotel television services.
7. The district court made five "f