**ALENIA SPAZIO, S.P.A. and Finmeccanica, S.p.A., Appellants,**

v.

**Dennis A. REID, Appellee.**

**No. 14–03–00366–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 23, 2003.

Rehearing Overruled April 8, 2004.

George W. Vie, III, Galveston, TX, John P. Cooney, New York City, for appellants.

Anne M. Pike, Michael Ernest Richardson, Houston, TX, for appellees.

Panel consists of Justices EDELMAN, FROST, and SEYMORE.

## MAJORITY OPINION

KEM THOMPSON FROST, Justice.

Appellants Alenia Spazio, S.p.A. and Finmeccanica, S.p.A. (collectively, the "Italian Companies") bring this interlocutory appeal from the trial court's order denying their special appearances in a lawsuit filed by appellee Dennis A. Reid ("Reid"). We reverse the trial court's order and remand with instructions to dismiss the claims against the Italian Companies for lack of personal jurisdiction.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Reid, a Canadian citizen, brought the underlying suit asserting a host of derivative claims against several defendants, including the Italian Companies—two foreign-resident corporations organized under the laws of Italy and having their headquarters and principal places of business in Rome, Italy. The claims involve an alleged business venture for the commercialization of Russian satellites and orbital slots.

The dispute arose from Russia's need to replace several obsolete satellites to avoid losing certain of its geosynchronous orbital slots. The Russian Satellite Communications Company ("RSCC") was responsible for allocating and licensing Russian satellite communication frequencies. Dr. Valery Aksamentov, a Russian space scientist who lived and worked in Houston, Texas, learned from a relative who worked for RSCC that Russia might lose certain orbital slots because it could not afford to replace several obsolete satellites. After learning about this situation, Aksamentov developed a plan to commercialize these orbital slots and then, with funding from outside Russia, build, launch, and operate new satellites to maintain them. This plan was called the Gorizont Satellite Replacement Program ("Plan"). Aksamentov worked with RSCC to obtain approvals from the Russian government to commercialize these orbital slots. In 1997, Aksamentov and others formed U.S. Russian Telecommunications, L.L.C. ("USRT"), a Delaware limited-liability company, to further develop the Plan, which included the launching and building of satellites to fill the orbital slots.

According to Reid's pleading, in 1997, USRT and the Italian government began discussing funding for the Plan. Admiral Giorgio Capra of the Italian Navy was present during these discussions. Capra soon brought the Alenia Spazio division of Finmeccanica, S.p.A.[1] into the discussions. Communications concerning a potential business relationship between Alenia and USRT ensued. Phone calls were made

and faxes were sent between Alenia in Italy and Aksamentov at his home in Houston. Reid alleges that in December of 1997, an oral joint venture was created between USRT and Alenia at a meeting in Rome. In January of 1998, representatives of USRT and Alenia met in Moscow. That same month, two Alenia representatives spent one day in Houston negotiating a Memorandum of Agreement ("MOA"). A representative of Alenia signed this MOA ("January 27, 1998 MOA") in Italy.

RSCC transferred its control of the orbital slots to Inspace, another Russian company, in the spring of 1998. In April of the same year, USRT, Alenia, and Inspace signed an MOA, the first signed by these three parties, in which they outlined various concepts that might be used to develop and implement the Plan; however, this MOA stated that "[e]xcept as to the confidentiality provisions of Section 6 which is meant to be binding, this Memorandum is expressly acknowledged to be an aid to further discussions between the Parties and neither creates nor implies the existence of any contractual rights or obligations among the Parties as to the subjects addressed herein."

Shortly thereafter, Alenia and USRT signed another MOA ("May 12, 1998 MOA") which expressly superseded the January 27, 1998 MOA. The May 12, 1998 MOA contained a provision choosing the laws of the United Kingdom and providing that London would be the place for arbitration of any disputes between the parties. The May 12, 1998 MOA stated that, upon the execution of a legally enforceable

---

1. We refer to the two corporate appellants in this action as the "Italian Companies." We note, however, that during the time period giving rise to Reid's claims, Alenia Spazio, S.p.A., which we refer to as "Alenia," was a division of Finmeccanica, S.p.A. Finmeccanica's ownership structure changed in 1999, and again in 2000, but its owners have been, in varying degrees, the Italian Treasury Ministry, IRI (a company wholly owned by the Italian Treasury Ministry), and partial public ownership by listing of shares on the Milan stock exchange. Alenia became Alenia Spazio, S.p.A. on April 1, 2000, and is wholly owned by Finmeccanica.

contract and upon acquiring sufficient financing, Alenia would purchase fifty percent of the equity of USRT. However, any obligations that might have existed under the May 12, 1998 MOA were expressly conditioned on the acquisition of credit facilities for $450 million and $100 million. Reid alleges in his petition that this funding was never obtained, and the Italian Companies agree that this is correct.

On May 15, 1998, Alenia, USRT, and Inspace signed an MOA ("May 15, 1998 MOA") that superseded the April 1998 MOA. This MOA stated that "[e]xcept as to [certain confidentiality and exclusivity provisions] which are meant to be binding [sic] this MOA is expressly acknowledged to be an aid to further discussions among the Parties in order to reach binding, final agreements on the subject matter hereof and neither creates nor implies the existence of any contractual rights or obligations among the Parties as to the subjects addressed herein." In May of 1998, Aksamentov faxed a letter to Alenia requesting a $100,000 advance of a $500,000 loan to cover USRT operating costs. Alenia subsequently wired $50,000 to a bank in Pennsylvania to be forwarded to a USRT account. Alenia's wiring instructions indicated that USRT had a Roswell, Georgia address, but USRT produced a USRT account that reflects a $50,000 credit, and shows a Houston, Texas address.

According to Aksamentov, the "Italians" recommended that USRT should be wholly owned by an Italian citizen to increase the chances of funding from the Italian government. Reid alleges that USRT was sold in October of 1998 to USRT Holdings, L.L.C., a Delaware company owned by Capra (then retired from the Italian Navy). According to Reid, USRT was purchased for $300 million, to be paid from future revenues earned by USRT in the alleged joint venture. Aksamentov was chairman of the board and chief executive officer of USRT before its sale; after the sale, he remained chairman of the board but was chief operating officer for Russian Affairs rather than chief executive officer. Reid alleges that Capra became the chief executive officer after the sale. Later, in March of 1999, Aksamentov resigned from all of his positions with USRT. Reid was appointed chief financial officer of USRT after its acquisition, and Jon Reed was made its president. Capra gave a five percent ownership interest in USRT Holdings to each. Reid later acquired Reed's five-percent interest.

Reid claims that in May of 1999, Davide Siniscalchi, USRT's chief operating officer, told him about a meeting that had taken place in Rome on May 19, 1999, between Capra and Giuseppe Viriglio of Alenia, during which the two men allegedly discussed a proposal in which USRT would transfer its rights in the alleged joint venture to Alenia in exchange for Alenia "issuing" a lump sum payment of between $20 million and $30 million as well as unspecified future compensation to Capra, Siniscalchi, Reed, and Reid. Reid contends this arrangement would have allowed USRT to avoid financial obligations to its former members by ensuring that USRT did not earn any income from the alleged joint venture. Reid asserts that he and Reed both refused to participate in this proposal and were fired in August of 1999. Reid alleges Alenia later terminated the May 12, 1998 MOA and the alleged joint-venture agreement on grounds that implementation of the Plan was too remote and unlikely.[2] The record shows that, on De-

---

2. Under its own terms, the May 15, 1998 MOA expired on July 14, 1998, because the parties had not entered into any binding final agreement for implementation of the first phase of the Plan.

cember 20, 1999, Alenia sent a letter to Siniscalchi stating that the May 12, 1998 MOA was no longer in effect and indicating that there was no relationship between USRT and Alenia regarding the Plan. Reid alleges the first replacement satellite was launched in late 1999, with financing from Alenia, but without USRT involvement. Reid also contends additional satellites have since been launched and are being developed.

Reid filed derivative claims on behalf of USRT and USRT Holdings, L.L.C. against the Italian Companies, Siniscalchi, and Capra. These claims relate to the alleged joint-venture agreement.[3] The Italian Companies filed special appearances contesting personal jurisdiction. After a hearing at which no additional evidence was presented, the trial court denied the special appearances. By this interlocutory appeal, the Italian Companies now challenge the trial court's decision.

## II. STANDARD OF REVIEW

Whether the Italian Companies are subject to personal jurisdiction in Texas is a question of law subject to de-novo review. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). The trial court did not issue any findings of fact or conclusions of law. Therefore, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's decision. *Id.* at 795. Parties may challenge the legal and factual sufficiency of these implied factual findings. *Id.* In

conducting a no-evidence analysis, we review the evidence in a light that tends to support the disputed findings and disregard all evidence and inferences to the contrary. *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). If more than a scintilla of evidence exists, it is legally sufficient. *Id.* More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Id.* at 782–83.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet,* 61 S.W.3d 599, 615–16 (Tex. App.-Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment.[4] *Pascouet,* 61 S.W.3d at 616.

---

3. Reid asserts the following claims against the Italian Companies: (1) breach of an alleged joint-venture agreement on behalf of USRT; (2) breach of an alleged fiduciary duty arising out of the alleged joint-venture agreement with USRT; (3) conversion of USRT assets, including the right to participate in and receive profits from the Plan; and (4) tortious

interference with an alleged contract between USRT and Inspace.

4. Reid claims the Italian Companies have waived any legal or factual sufficiency challenges to the trial court's implied findings of fact because their briefing contains no issues or argument explicitly asserting that these findings are not supported by legally or factu-

## III. ANALYSIS AND DISCUSSION

■ In their two issues, the Italian Companies challenge the trial court's implied findings of specific and general jurisdiction. The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. TEX. CIV. PRAC. & REM.CODE §§ 17.041–.045; *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). It allows courts to exercise personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software,* 83 S.W.3d at 795. Thus, we rely on precedent from the United States Supreme Court and from other federal courts, as well as Texas decisions, in determining whether a nonresident defendant has shown the exercise of personal jurisdiction violates federal due process guarantees. *Id.*

■ Personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established "minimum contacts" with the forum state, and (2) the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *BMC Software,* 83 S.W.3d at 795. A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of conducting business in Texas has sufficient contacts to allow Texas courts to exercise personal jurisdiction over the nonresident. *Id.* Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established "minimum contacts" with Texas. *Id.* The concept of "foreseeability" is implicit in the requirement that there be a "substantial connection" between the Italian Companies and Texas arising from the Italian Companies' conduct purposefully directed toward Texas. *See Guardian Royal Exch. Assur., Ltd.,* 815 S.W.2d at 227. A defendant should not be subject to a Texas court's jurisdiction based upon random, fortuitous, or attenuated contacts. *BMC Software Belgium, N.V.,* 83 S.W.3d at 795.

**A. Did the trial court properly conclude that it could exercise personal jurisdiction over the Italian Companies based on specific jurisdiction?**

■ In conducting a specific-jurisdiction analysis, we must focus on the relationship among the Italian Companies, Texas, and the litigation.[5] *See Guardian Royal Exch. Assur., Ltd.,* 815 S.W.2d at 228. Specific jurisdiction exists when the plaintiff's claims arise from or relate to the defendant's purposeful contacts with Texas. *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.

---

ally sufficient evidence. Although the Italian Companies have not explicitly challenged the trial court's implied findings of fact, their briefing does assert that USRT's principal place of business was not in Texas, and they cite evidence in the record in support of this argument. The Italian Companies also argue that they have not been involved in any transaction in Texas and that the record does not show that the Italian Companies have sufficient contacts with Texas to satisfy specific or general jurisdiction. We conclude that a challenge to the trial court's implied findings in favor of jurisdiction is a subsidiary question fairly included in the Italian Companies' issues and that the Italian Companies have sufficiently briefed this challenge. *See* TEX.R. CIV. P. 38.1(e), (h), 38.9; *Stephenson v. LeBoeuf,* 16 S.W.3d 829, 843–44 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

5. The Italian Companies assert that Reid did not allege any act by the Italian Companies in Texas and that, therefore, they only had to prove that they are nonresidents of Texas to be entitled to dismissal. *See Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 438 (Tex.1982). After reviewing Reid's original and supplemental petitions, we conclude Reid satisfied this pleading requirement.

2002). Reid argues the Italian Companies are subject to specific jurisdiction in Texas for the following reasons: (1) Reid's breach-of-contract claim arises from or relates to the Italian Companies' purposeful contacts with Texas; (2) the evidence shows that the Italian Companies' alleged tortious conduct occurred, in part, in Texas; and (3) the Italian Companies engaged in alleged tortious conduct outside of Texas that was expressly aimed at Texas, knowing that the brunt of the injury from their conduct would be felt by USRT in Texas.

### Reid's Breach-of-Contract Claim

Reid alleges that the Italian Companies breached an oral joint-venture agreement with USRT that allegedly was formed in Italy in December of 1997. Reid claims the Italian Companies breached this agreement by excluding USRT from the Plan and by failing to share revenues received from the execution of the Plan. The Plan contemplated obtaining rights from the Russian government to certain orbital slots for communications satellites. These satellites were to have been manufactured by Alenia in Italy with financing from the Italian government, and then placed in geosynchronous orbit over Russia by means of launches from stations located in Russia. Reid's affidavit indicates that, on May 19, 1999, in Rome, Alenia and USRT discussed the possibility of USRT transferring any and all rights in the Plan to Alenia; however, there is no indication in the record that such a transfer ever occurred.[6] Rather, Reid's affidavit states that he and Jon Reed were terminated from their respective positions at USRT in August of 1999, immediately after they refused to go along with such a transfer of rights by USRT.[7] According to Reid, after these events, in late 1999, Alenia began implementing the Plan without USRT's participation. Viriglio's deposition shows that, on December 20, 1999, Alenia sent a letter to Siniscalchi in Illinois, as a representative of USRT, stating that the May 12, 1998 MOA was no longer in effect and indicating that there was no relationship between USRT and Alenia regarding the Plan. Therefore, the Italian Companies' alleged breach of the purported oral joint-venture agreement occurred in late 1999, when, Reid claims, the Italian Companies put the Plan into effect without USRT's participation.[8]

Reid asserts his claims based on his stock ownership in USRT Holdings and by means of a double derivative action in which, acting on behalf of USRT Holdings, he asserts a claim on behalf of USRT. *See* Tex. Bus. Corp. Act art. 5.14K (stating that derivative actions involving foreign corporations are governed by the law of the state of incorporation, except as to procedural issues not relating to the internal affairs of the corporation); *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 (Del.1988) (de-

---

**6.** Viriglio testified at his deposition that he did meet with a representative of Inspace (Topalov) and Capra on May 19, 1999, but that Viriglio did not participate in any conversations about transferring anything away from USRT. However, for purposes of this appeal, we presume for the sake of argument that the discussion occurred as stated in Reid's affidavit.

**7.** Reid's affidavit states that USRT terminated Reed in August of 1999, and that USRT terminated Reid from his position as manager and board member in August of 1999. However, Reid's affidavit states USRT did not terminate Reid from his position as chief financial officer until September 8, 1999.

**8.** In conducting the jurisdictional analysis, we do not adjudicate the merits of Reid's claims, and it should be noted that, in a deposition taken in September of 2002, Viriglio denied that Alenia had taken any active role in implementing the Plan.

scribing double derivative action under Delaware law). Though Reid is asserting a breach-of-contract claim that allegedly belongs to USRT, any recovery in this case would go to USRT Holdings, not USRT. *See Sternberg*, 550 A.2d at 1124.

Reid asserts that this breach-of-contract claim arises from or relates to the following contacts with Texas:

- Alenia's alleged joint-venture agreement with USRT, a company that Reid claims had a principal place of business in Houston, Texas, at all material times;

- Alenia's negotiation in Houston, Texas of the January 27, 1998 MOA relating to the alleged joint venture;

- Alenia's entering into the MOAs that contemplated performance, in part, in Texas;

- Alenia's numerous communications with Texas by telephone and facsimile;

- Alenia's wiring money to USRT in connection with the alleged joint venture.

In many respects the facts are not disputed, but the parties vigorously dispute the principal place of business of USRT. Reid claims that it is in Texas, and the Italian Companies claim it is in Georgia. Aksamentov admitted in his affidavit that the MOAs between Alenia and USRT state that USRT's principal place of business is in Roswell, Georgia. Further, USRT sent Alenia a document entitled "Brief History of USRT" that stated "[o]perations of USRT are directed from USRT's offices in Atlanta, Georgia." Other evidence suggests the principal place of business may have been in Texas. Aksamentov testified that, in January of 1998, he sent Alenia a

copy of USRT's "operating agreement." Although he does not further describe this document, and though our record contains no document by that name, we presume for the sake of argument that Aksamentov sent Alenia the USRT Limited Liability Company agreement that is contained in our record. This document states that as of January 3, 1997, the principal office of USRT is in Houston, Texas.

██ Under the applicable standards for evaluating the conflicting evidence as to the location of USRT's principal place of business, we conclude that there is legally and factually sufficient evidence to support the trial court's implied finding that USRT had a principal place of business in Texas from its creation until August of 1999. However, we find the evidence legally insufficient to support an implied finding that USRT's principal place of business was in Texas after Reed's termination in August of 1999. The uncontroverted evidence shows that USRT never had any employees, that USRT did not compensate its officers, and that the only activities conducted by USRT were actions taken by its officers relating to the Plan. In this context, it is somewhat difficult to determine what the principal place of business of USRT was at any given time. Nonetheless, there is no evidence in the record of any remaining officers operating in Texas, or of any activity by USRT in Texas, after USRT terminated Reed in August of 1999.[9]

Based on our evaluation of the quality and nature of the Italian Companies' contacts with Texas, we conclude that their alleged breach of contract did not arise from or relate to these contacts. *See Guardian Royal Exchange Assur., Ltd.*,

---

**9.** The record shows that after Reed's departure, Reid, a Canadian citizen, continued as chief financial officer until September 8, 1999, when he ceased to be an officer. The others continuing to serve as officers were Siniscalchi, an alleged Illinois resident, and Capra, a citizen and resident of Italy.

815 S.W.2d at 224 n. 11 (Tex.1991) (stating that, in analyzing minimum contacts, it is not the number, but rather the quality and nature of the nonresident defendant's contacts with Texas that is important). The Italian Companies are alleged to have breached an oral joint-venture agreement, allegedly created in Italy, that concerned the Plan—a program that was centered in Italy and Russia and involved financing from the Italian government and approval of the Russian government. The Italian Companies allegedly breached this contract in late 1999, when they went forward with the Plan, in Italy and Russia, without USRT's participation. At the time of this alleged breach, USRT did not have its principal place of business in Texas. Further, after October of 1998, and at the time of the alleged breach, USRT was wholly owned by USRT Holdings, which is ninety percent owned by an Italian citizen (Capra) and ten percent owned by a Canadian citizen (Reid). Even though USRT's principal place of business may have been in Texas until August of 1999, Reid's claim seeking monetary recovery in favor of USRT Holdings—based on the breach of an alleged agreement made in Italy and allegedly breached in Russia and Italy—does not arise from or relate to the Italian Companies' purposeful contacts with Texas. *See American Type Culture Collection, Inc.*, 83 S.W.3d at 806; *Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.*, 994 S.W.2d 684, 691–93 (Tex.App.-San Antonio 1998, no pet.) (finding no specific jurisdiction over contract assignees despite contract with Texas corporation, partial performance in Texas, communications with Texas, and sending payments to Texas).

■■■■■ Contracting with a Texas entity alone does not satisfy the minimum-contacts requirement. *See Old Kent Leasing Servs. Corp. v. McEwan*, 38 S.W.3d 220, 230 (Tex.App.-Houston [14 Dist.] 2001, no pet.). Here, there is also some evidence of funds being credited to a USRT account with a Texas address. Although it is not clear that Alenia knew that the payment was going to a Texas account because the wiring instructions indicated that the money was being sent to a bank in Pennsylvania, to be forwarded to USRT, the record contains evidence that Alenia wired $50,000 to USRT and that this amount was credited to a USRT account with an address in Houston, at a time when USRT's principal place of business was in Texas. Nevertheless, sending funds to Texas is not determinative. *See Shell Compañia Argentina De Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 839 (Tex.App.-Hous. [1 Dist.] 2002, no pet.). Likewise, numerous telephone and facsimile communications with people in Texas relating to an alleged contract do not establish minimum contacts. *TeleVentures, Inc. v. International Game Tech.*, 12 S.W.3d 900, 910 (Tex.App.-Austin 2000, pet. denied); *Magnolia Gas Co.*, 994 S.W.2d at 691–92.

Reid relies on *Fish v. Tandy Corp.*, 948 S.W.2d 886, 895 (Tex.App.-Fort Worth 1997, pet. denied). The *Fish* court found specific jurisdiction in a Texas corporation's action for a declaration of the rights and duties under a letter agreement executed by the nonresident defendant and the Texas corporation after negotiations that included personal visits by the defendant to Texas. *See id.* at 890–95. In this case, however, the basis of Reid's suit is his allegation of an oral joint-venture agreement allegedly formed during a meeting in Italy in December of 1997. There is no evidence of prior negotiations regarding this alleged joint venture in Texas. Therefore, we conclude *Fish* is distinguishable.

Although the evidence shows that two Alenia representatives negotiated the terms of the January 27, 1998 MOA during a one-day meeting in Houston, Alenia signed this document in Italy. Furthermore, the January 27, 1998 MOA was superseded by the May 12, 1998 MOA, which contained a choice of law provision mandating application of United Kingdom law and providing for arbitration in London. The May 12, 1998 MOA did recite that, upon the execution of a legally enforceable contract and upon acquiring sufficient financing, Alenia would purchase fifty percent equity in USRT. However, any obligations that might have arisen under the May 12, 1998 MOA were expressly conditioned on the acquisition of credit facilities for $450 million and $100 million. The parties do not dispute that this financing was never obtained. In this context, we conclude that negotiation of a superseded MOA during a one-day meeting in Houston and the potential obligation to purchase USRT stock that never came to fruition are not sufficiently related to Reid's claims to support specific jurisdiction.[10] *See TeleVentures, Inc.,* 12 S.W.3d at 910.

### Reid's Tort Claims

 Reid also alleges that the Italian Companies engaged in tortious conduct, in part, in Texas. According to his pleadings, the Italian Companies breached fiduciary duties to USRT by wrongfully removing USRT from the alleged joint venture, converting and misappropriating the joint venture's assets, and usurping the joint venture's business opportunities. However, based on the record before us, the only asset that Reid claims was converted and the only opportunity he claims was

usurped was USRT's alleged rights to develop and profit from the Plan as part of the alleged joint venture with Alenia. Therefore, though Reid is entitled to plead various torts, both his breach-of-fiduciary-duty claim and his conversion claim are based on Alenia's alleged wrongful removal of USRT from the alleged joint venture. The record shows that if Alenia continued the development and implementation of the Plan without USRT, it would have done so in Italy and Russia. Further, Alenia's December 20, 1999 letter to USRT—stating that the May 12, 1998 MOA was no longer in effect—was sent to Siniscalchi in Illinois. After reviewing the record, we find no evidence that this alleged wrongful removal occurred in Texas in such a manner as to support specific jurisdiction. *See BMC Software Belgium, N.V.,* 83 S.W.3d at 796–97 (finding no evidence of tort committed in Texas).

Reid also asserts that Capra, Siniscalchi, and the Italian Companies conspired to wrongfully remove USRT from the alleged joint venture. However, the only evidence in the record that arguably might relate to such a conspiracy is Reid's description of a phone call from Siniscalchi in which Siniscalchi allegedly described discussions in Rome, between Viriglio of Alenia and Capra of USRT. Reid claims these discussions occurred in Italy, not in Texas. Even if Reid were in Texas when Siniscalchi telephoned him,[11] Siniscalchi's act in making this phone call to Reid cannot be counted as a contact of Alenia with Texas, because Siniscalchi was an officer of USRT, not an agent or representative of Alenia. *See National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773 (Tex.1995) (stating alleged co-conspirator's contacts

---

10. To the extent that Reid alleges tortious conduct based on the same actions alleged under the breach-of-contract theory, the same analysis applies.

11. The record does not reflect where Reid or Siniscalchi were located during this phone call.

with Texas cannot be counted as contact of other alleged co-conspirators). There is no evidence that any alleged conspiratorial conduct by the Italian Companies occurred in Texas.[12]

Reid also claims that Alenia directed Reed, a Texas resident, to commit a tort in Texas by asking him to approve and participate in an allegedly tortious proposal for USRT to transfer its rights in the alleged joint venture to Alenia in exchange for payments to Reed and others. However, there is no evidence that Alenia ever directed Reed to do this. In any event, Reid testified in his affidavit that Reed refused to be part of this alleged proposal, and Reid does not allege or seek recovery for any damages based on any conduct by Reed in following Alenia's alleged direction to participate in this proposal.

Finally, as to Reid's contention that the Italian Companies tortiously interfered with agreements between USRT and the Russian company Inspace, there is no evidence in the record that any of the alleged interference took place in Texas. *See BMC Software Belgium, N.V.,* 83 S.W.3d at 796–97 (finding no evidence of tort committed in Texas). In sum, the record contains no evidence that the Italian Companies' alleged tortious conduct occurred in Texas.

***Brunt of Alleged Injury under Reid's Tort Theories***

■ Reid also asserts that, even if Alenia's allegedly tortious conduct occurred outside of Texas, the exercise of specific jurisdiction is still appropriate because Alenia's actions were expressly aimed at Texas and Alenia knew that the brunt of the alleged injury caused by this conduct would be felt by USRT in Texas. *See Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984); *Rittenmeyer v. Grauer,* 104 S.W.3d 725, 735 (Tex.App.-Dallas 2003, no pet.). Even assuming for the sake of argument that Alenia engaged in tortious conduct and knew that this conduct would harm USRT, Reid's petition and affidavit both state that this conduct occurred after USRT terminated Reid and Reed. At the time of the alleged tortious conduct, USRT was a Delaware corporation owned by USRT Holdings, with no employees and no officers or directors in Texas. Therefore, we conclude Alenia could not have expressly aimed its allegedly tortious conduct at Texas or known that the brunt of any injury from such conduct would be felt in Texas.

Reid's affidavit indicates that on May 19, 1999, an Alenia representative (Viriglio) and Capra, while in Rome, discussed the possibility of USRT transferring its rights in the alleged joint venture to Alenia in exchange for a lump sum to be paid to Capra, Siniscalchi, Reed, and Reid. There is no evidence that any such transfer ever occurred. Instead, the evidence shows Alenia sent a letter dated December 20, 1999, stating the May 12, 1998 MOA was no longer in effect, and Reid alleges that in

---

**12.** Reid asserts that *General Elec. Co. v. Brown & Ross Int'l Distributors, Inc.* stands for the proposition that a defendant who participates in a conspiracy known to impact Texas has satisfied the requirements for specific jurisdiction. *See* 804 S.W.2d 527, 533 (Tex.App.-Houston [1st Dist.] 1990, writ denied). We disagree. Although the analysis is difficult because the *Brown & Ross* court never identifies what tort claims the plaintiff in that case was asserting, the court did not state that mere participation in a conspiracy known to impact Texas was sufficient. *See id.* Rather, the *Brown & Ross* court concluded that there was jurisdiction because the record showed that the defendant in question knew *his conduct* would affect Texas customers. *See id.* This is consistent with the *Calder v. Jones* line of cases discussed in the next section. *See Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984).

late 1999, the Italian Companies implemented the Plan without USRT's participation. Therefore, this alleged proposal never came to fruition and cannot be evidence that Alenia committed a tort directed at Texas with the knowledge that the brunt of the injury would be felt in Texas. Accordingly, we find personal jurisdiction cannot be based on this theory.

On this record, we conclude that the Italian Companies' very limited contacts with Texas relating to the subject matter of this lawsuit are insufficient to support the exercise of specific jurisdiction.

**B. Did the trial court properly conclude that it could exercise personal jurisdiction over the Italian Companies based on general jurisdiction?**

 General jurisdiction is a more demanding minimum-contacts analysis, requiring a showing that the defendants conducted substantial activities within the forum. *CSR, Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996). General jurisdiction does not require that the plaintiff's claims arise from or relate to the defendants' activities purposefully directed to Texas. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). General jurisdiction exists when the defendant in question has "continuous and systematic general business contacts" with the forum state. *Id.,* 466 U.S. at 416, 104 S.Ct. at 1873; *American Type Culture Collection, Inc.,* 83 S.W.3d at 809. General jurisdiction is based upon the concept of a bargain between the nonresident defendant and the forum state. If the defendant has established continuous and systematic general business contacts with the state, it is deemed to have purposely availed itself of the protections and benefits of the forum's law, and thereby to have consented to suit in the forum. *See Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 375 (5th Cir.

1987). In conducting a general-jurisdiction analysis, we are concerned with the quality rather than the quantity of the contacts. *See American Type Culture Collection, Inc.,* 83 S.W.3d at 809–10. In assessing the quality of the contacts, we do not view each contact in isolation; rather, we carefully investigate, compile, sort, and analyze all contacts to determine if together they are sufficient to support general jurisdiction. *See id.* at 809.

In addition to the contacts identified in the specific-jurisdiction analysis, Reid asserts the following contacts support the trial court's implied finding of general jurisdiction:

● Under Alenia's contract with the Italian Space Agency relating to the International Space Station Project ("Space Station Project"), one Alenia employee worked as a representative of the Italian Space Agency at an office in the Johnson Space Center (the "Space Center") in Texas from 1996 until 2000, another Alenia employee worked in the same capacity from November of 1999 to the present, and another from December of 2001 to the present.

● Since 1998, at least 117 employees of Alenia have traveled to the Space Center in connection with the Space Station Project, averaging at least fifty employees traveling per year, with an average of more than ten days in Texas per employee.

● Since 1998, at least sixty different employees of Alenia have directed communications by telephone, facsimile, mail, or e-mail to individuals located at the Space Center in connection with the Space Station Project.

● On at least two occasions, Alenia sent a shipment from Italy to the Space Center.

● The Italian Companies had a contract with The Dee Howard Company, a Texas corporation and subsidiary of Finmeccanica, that contains a Texas choice-of-law provision and contemplates performance in Texas.

Since 1996, under its contract with the Italian Space Agency, Alenia has had at least one and sometimes two employees at the Space Center in Texas. Acting as representatives of the Italian Space Agency, these Alenia employees provide technical support and liaison services relating to the Space Station Project. The Space Station Project has nothing to do with the dispute that is the basis of this suit. Although the presence of at least one Alenia employee in Texas since 1996 has been continuous, our jurisdictional inquiry and analysis does not end there. We must determine if this contact and the other contacts reflected in the record constitute "continuous and systematic general business contacts" with Texas. *See Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 416, 104 S.Ct. at 1873; *American Type Culture Collection, Inc.*, 83 S.W.3d at 809.

 The record shows the one or two Alenia employees present at the Space Center were given use of a telephone and an office at the Space Center. The extension for this telephone was listed in the phone directory for the Space Center under the general heading "Italian Space Agency" and an individual entry under a subheading "Alenia Representative." These employees were present at the Space Center pursuant to a $300 million contract between Alenia and the Italian Space Agency. The record does not reflect how much Alenia has been paid for providing these employees on location at the Space Center; however, given the nature and magnitude of the contract (to design and build components of the Space Station Project), the compensation for providing these two employees is likely a small part of the $300 million contract price. Further, the record shows the Italian Companies are organized and exist under Italian law, have principal places of business in Italy, are not qualified or authorized to conduct business in Texas, do not maintain an inventory in Texas, and have no sales representatives, distributors, brokers or wholesalers in Texas. Moreover, nothing in the record suggests the Italian Companies have undertaken any efforts to exploit Texas markets. They have no bank accounts or listings in any public telephone directory in Texas. They have not commenced suit in any Texas state courts or filed claims in any Texas proceedings. They have not paid taxes or franchise fees in Texas, do not regularly advertise in Texas, and have no authorized agents to accept service of process in Texas.

 Reid argues that general jurisdiction exists because Alenia has had an office at the Space Center since 1996. However, having an office in the forum state does not require a finding of general jurisdiction. *See Submersible Sys., Inc. v. Perforadora Central, S.A. de C.V.*, 249 F.3d 413, 419 (5th Cir.2001) (having a construction project and maintaining an office with three employees in forum state did not satisfy standard for general jurisdiction); *Villar v. Crowley Maritime Corp.*, 780 F.Supp. 1467, 1480–81 (S.D.Tex.1992) (stating that simply having an office in the forum state does not establish general jurisdiction), *aff'd* 990 F.2d 1489 (5th Cir. 1993). The significance of this contact depends on the type and nature of office maintained. If a defendant maintains a permanent general business office through which it solicits business in Texas, then this factor tends to weigh strongly in favor of general jurisdiction. *See James v. Illi-*

*nois Cent. Railroad Co.*, 965 S.W.2d 594, 598 & n. 1 (Tex.App.-Houston [1st Dist.] 1998, no pet.) (holding there was general jurisdiction where defendant solicited business in Texas through general business office). There is nothing to suggest Alenia maintained such an office in Texas. Rather, the record indicates that (1) Alenia was provided the use of an office, including a telephone line, at the Space Center to allow its employees to provide technical support and liaison services relating to the Space Station Project; and (2) this office contained the logo for the Italian Space Agency, not the logo for Alenia. The record indicates that Alenia does not utilize this office to promote or market its goods or services in Texas, or for any purpose other than supporting the Space Station Project. The nature of this office and its very limited purpose and function significantly diminish the quality of the Italian Companies' contacts with Texas.[13]

Further, the record shows that the only reason Alenia sent employees to the Space Center is that this location was chosen by the National Aeronautics and Space Administration ("NASA") as the location for these services. Alenia has contracts with the Italian Space Administration, the European Space Administration, and a German space agency relating to the Space Station Project. The record indicates that (1) these contracts require Alenia to perform various services in coordination with NASA; (2) the contracts do not specifically require Alenia to perform services in Tex-

as; (3) NASA decided that some of these services would be performed at the Space Center in Texas; and (4) before entering into these contracts Alenia understood that some of its services would be performed at the Space Center. NASA, rather than the Italian Companies, decided that some of Alenia's services under the contracts with three European entities would be performed at the Space Center. We conclude that the nature of this arrangement also significantly diminishes the quality of these contacts and does not indicate that the Italian Companies purposefully directed their business activity at Texas. *See American Type Culture Collection, Inc.*, 83 S.W.3d at 809 (discounting quality of contacts regarding defendant's attendance at five conferences in Texas because defendant did not select the location of the conferences); *Reyes v. Marine Drilling Cos., Inc.*, 944 S.W.2d 401, 402–04 (Tex. App.-Houston [14th Dist.] 1997, no writ) (discounting quality of contacts where defendant sent representatives to Texas at least 204 times to perform quality-assurance inspections, because these inspections were necessitated by defendant's contractual obligations with the United States government); *Conner v. ContiCarriers and Terminals, Inc.*, 944 S.W.2d 405, 417–18 (Tex.App.-Houston [14th Dist.] 1997, no writ) (plurality op.) (discounting quality of contacts in which defendant's customer, not defendant, chose Texas destination for transportation services); *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 787 (5th Cir.

---

**13.** Reid asserts that *Perkins v. Benguet Consolidated Mining Co.* shows that a company need not target the forum market for there to be general jurisdiction. *See* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). However, the *Perkins* case involved unusual facts. In *Perkins,* the defendant company's regular business operations in the Philippines were completely halted during the occupation of the Philippines by Japan, and the company's principal stockholder effectively transferred the

company's main office to Ohio during the Japanese occupation of the Philippines. *See id.,* 342 U.S. at 447–49, 72 S.Ct. at 419–20. *Perkins* may indicate that targeting the forum-state market is not necessary if the defendant's regular business operations are halted and the center of corporate decision-making is transferred to the forum state, but these are not the facts before us in this case. *See American Type Culture Collection, Inc.,* 83 S.W.3d at 809–10 (distinguishing *Perkins* ).

1990) (finding no jurisdiction and discounting quality of contacts regarding 20 port calls of vessel in forum state because company that managed vessels did not choose where vessels would make port); *Conner v. Bouchard Transp. Co., Inc.,* 1994 A.M.C. 258, 1993 WL 388274, at *1–*3 (E.D.Pa. 1993) (finding no general jurisdiction despite over 100 port calls in forum state by defendant-owner's vessel, because all visits were prompted by chartering agreement in which charterer determined destination of defendant's vessels); *American Overseas Marine Corp. v. Patterson,* 632 So.2d 1124, 1126–30 (Fla.App.1994) (finding no jurisdiction and discounting quality of contacts relating to port calls in forum state because they were not by the choice of defendants but at the direction of the United States military under contracts with the United States).

■ The record also contains a contract between Alenia and The Dee Howard Company, a Texas corporation owned by a subsidiary of Finmeccanica. Though this contract contains a Texas choice-of-law provision, it has no forum-selection provision. Reid asserts that by agreeing to this Texas choice-of-law provision, Alenia availed itself of the benefits and protections of Texas law and consented to being sued in Texas. We disagree. By agreeing to a Texas choice-of-law provision, a party does not avail itself of any protection from Texas courts or voluntarily submit to personal jurisdiction in Texas courts, absent an express understanding to that effect. *See Moni Pulo Ltd. v. Trutec Oil and Gas, Inc.,* 130 S.W.3d 170, 176, 2003 WL 22902720, at *2 & n. 15 (Tex.App.-Houston [14th Dist.] Dec. 4, 2003, no pet. h.). There is no evidence in the record of an express understanding that Alenia submitted to the jurisdiction of Texas courts by executing the contract with The Dee Howard Company. Moreover, the significance of this contract and its Texas choice-of-law provision is diminished by the fact that the contract is contingent upon Alenia seconding employees to The Dee Howard Company to perform the services anticipated to be performed under the contract. The record contains no evidence that Alenia ever seconded employees to The Dee Howard Company or that any services were ever performed under this contract. In this context, and from a qualitative standpoint, we do not view this contract and its choice-of-law provision as a significant contact in the general-jurisdiction analysis.

In *Reyes v. Marine Drilling Cos., Inc.,* this court found no general jurisdiction despite the following contacts of the defendant with Texas:

(1) The defendant had purchased goods in excess of $183 million in Texas from at least 471 persons and/or companies in Texas.

(2) The defendant had purchased over $63.3 million in products from a company in Houston, Texas and had entered into contracts with that company for equipment purchases and repairs.

(3) The defendant, as purchaser, had entered into 303 contracts and/or agreements with a company in Conroe, Texas.

(4) The defendant advertised for employees in five periodicals in Texas.

(5) The defendant had sold $851,511.88 worth of scrap metal to Texas companies, all of which was delivered in Mississippi.

(6) The defendant had sent representatives to Texas on at least 204 occasions to perform quality-assurance inspections necessitated by the defendant's obligations under contracts with the United States.

Despite the large quantity of contacts in *Reyes*, this court concluded there was no personal jurisdiction under a general-jurisdiction analysis because the record did not show a general business presence in Texas. *See id.* at 404–05. The defendant did not have a business office in Texas and did not distribute or market its products in Texas. *See id.* Similarly, in this case, there is no evidence the Italian Companies advertised or promoted their goods or services in Texas, solicited business in Texas, sold their goods or services to a Texas entity, established a general business office or general business presence in Texas, or targeted Texas markets.

After carefully analyzing the nature and quality of the Italian Companies' contacts with Texas, we find no continuous and systematic general business contacts with Texas such that these companies can be deemed to have consented to being sued in Texas. *See Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 416, 104 S.Ct. at 1873 (holding there was no general jurisdiction even though defendant sent its chief executive officer to Texas for a contract-negotiating session, accepted into its bank account checks drawn on a bank in Texas, purchased $4 million of goods and equipment from a company in Texas, and sent employees to Texas for training and technical consultation); *Submersible Sys., Inc.*, 249 F.3d at 419–21 (holding that having a construction project in forum state and maintaining an office with three employees in forum state did not satisfy standard for general jurisdiction); *Strick Corp. v. A.J.F. Warehouse Distribs., Inc.*, 532 F.Supp. 951, 956–60 (E.D.Pa.1982) (holding there was no general jurisdiction despite defendant's office in forum over four-year period because record did not show that defendant targeted the forum-state market or made a substantial number of sales in the forum); *CSR, Ltd.*, 925 S.W.2d at 595 (stating there must be an indication that defendant intended to serve the Texas market before personal jurisdiction may be found); *Michel v. Rocket Eng'g Corp.*, 45 S.W.3d 658, 671–82 (Tex.App.-Fort Worth 2001, no pet.) (holding record did not support general jurisdiction because it did not show that defendant created a general business presence in Texas through continuing and systematic activities); *Reyes*, 944 S.W.2d at 402–04 (holding there was no general jurisdiction despite defendant's purchase of large amounts of supplies from Texas companies and sending representatives to Texas at least 204 times to perform quality-assurance inspections). Therefore, we conclude a Texas court may not exercise personal jurisdiction over the Italian Companies under a general-jurisdiction theory.

**C. Did the trial court properly conclude that exercising personal jurisdiction over the Italian Companies would comport with traditional notions of fair play and substantial justice?**

In addition to sufficient minimum contacts with Texas, federal due process requires that the exercise of personal jurisdiction comport with traditional notions of fair play and substantial justice. *See Guardian Royal Exch. Assur., Ltd.*, 815 S.W.2d at 228. In deciding this issue, the court should consider the following factors:

- the burden on the defendants;
- the interests of the forum state in adjudicating the dispute;
- the plaintiff's interest in obtaining convenient and effective relief;
- the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and
- the shared interest of the several states in furthering fundamental substantive social policies.

*Id.* When, as here, the defendants are residents of another nation, the court should also consider:

- the unique burdens placed on the defendant who must defend itself in a foreign legal system;
- the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by a state court; and
- the United States government's interest in its foreign-relations policies.

*Id.* at 229.

 In considering the burden the Italian Companies would face were they forced to defend in Texas, we note that the record indicates that all official business records of USRT relating to the Plan are in Houston, Texas, and that potential witnesses Aksamentov, Reed, and Larry Bell reside in Texas. However, Reid, the plaintiff, resides in Canada. Other potential witnesses also reside outside of Texas— Siniscalchi (residing in Illinois), Capra (residing in Italy), current and former Alenia employees and Finmeccanica employees (residing in Italy), and third-party witnesses from Inspace and RSCC (residing in Russia). Though Alenia employees have traveled to Texas under contracts that Alenia has with the Italian Space Agency, the European Space Agency, and a German space agency, the record shows that, other than a suit filed by the former shareholders of USRT, the Italian Companies have never been sued in Texas. Allowing the suit to proceed in Texas would be expensive and burdensome for the Italian Companies and it would force them to defend against Reid's claims in a foreign legal system. *See id.* at 229.

Most significantly, we find that the interests of Texas in adjudicating this dispute are minimal. Reid, a Canadian resident and citizen, is asserting a double derivative action against two Italian companies, which, if successful, would result in a judgment in favor of USRT Holdings, a Delaware holding company owned ninety percent by an Italian resident and ten percent by a Canadian resident (Reid). The claim upon which USRT Holdings would recover at the request of Reid belongs to USRT. Although there is evidence to support a finding that USRT's principal place of business was in Texas through August of 1999, there is no evidence that its principal place of business has been in Texas since that time. Because this dispute does not involve any Texas entity and cannot result in a judgment in favor of any Texas entity, we conclude that Texas's minimal interest in this dispute strongly militates against the assertion of jurisdiction in this case. *See id.* at 223–33 (holding exercise of jurisdiction would offend traditional notions of fair play and substantial justice where Texas did not have a compelling interest in providing a forum for resolution of claims in which plaintiffs sought reimbursement for a non-Texas insurer, even though two of the plaintiffs were Texas corporations with principal places of business in Texas and even though the facts of the case involved a deceased Texas employee); *Bearry*, 818 F.2d at 377 (holding assertion of jurisdiction would be unreasonable primarily because suit implicated virtually no distinct interest of Texas).

Though the parties have thoroughly briefed most other aspects of the jurisdictional analysis, they have provided little assistance in assessing the procedural and substantive policies of other nations whose interests would be affected by a Texas court's assertion of jurisdiction. We note, however, that Reid seeks a multi-million-dollar judgment against Alenia, an Italian company, and its parent, Finmeccanica, an Italian company in which Italian govern-

ment entities own a 34 percent interest. Further, Reid seeks to recover based on an alleged plan that contemplated obtaining rights from the Russian government to certain orbital slots for communications satellites, manufactured by Alenia in Italy with financing from the Italian government, and placed in geosynchronous orbit over Russia by means of launches from stations in Russia. These facts raise important concerns regarding the substantive policies of Italy and Russia and the impact that the exercise of jurisdiction might have on the United States government's foreign-relations policies *vis-a-vis* these countries.

As for Reid's interest in obtaining convenient and effective relief, we note that Reid testified that litigating this matter in Italy would place a tremendous financial burden on him. Certainly litigating this dispute in Texas may be more cost-effective and convenient for Reid; however, it is not clear that his interest in effective relief will be better served by a Texas judgment. The United States is not party to any multilateral convention regarding recognition of foreign judgments. *See* Alan Reed, *A New Model of Jurisdictional Propriety For Anglo–American Foreign Judgment Recognition and Enforcement: Something Old, Something Borrowed, Something New?* 25 Loy. L.A. Int'l & Comp. L.Rev. 243, 245 n. 1 (2002). To obtain effective relief against the assets of the Italian Companies in Italy, if he becomes entitled to it, Reid, at some point, will have to convince the appropriate decisionmakers in the Italian judicial system that, under Italian law, he is entitled to enforce a valid Texas judgment against the Italian Companies, despite the absence of a bilateral treaty on this subject between Italy and the United States. Thus, although it may be less expensive and more convenient for Reid to litigate in Texas, the relief he can obtain here against the Ital-

ian Companies may not be more effective. *See Insurance Co. of N. Am. v. Marina Salina Cruz,* 649 F.2d 1266, 1273 (9th Cir. 1981) (stating that potential difficulties enforcing American judgment in foreign country may be considered in weighing the plaintiff's interest in obtaining convenient and effective relief); *In re Baldwin–United Corp.,* 607 F.Supp. 1312, 1330 (S.D.N.Y. 1985) (stating, in context of class-action settlement, that effective relief is essentially a judgment that is collectible and practical). Therefore, we find this factor does not weigh strongly in favor of the reasonableness of a Texas court exercising personal jurisdiction over the Italian Companies.

After considering all applicable factors and interests, we conclude that the exercise of personal jurisdiction by a Texas court over the Italian Companies would be unreasonable and would offend traditional notions of fair play and substantial justice.

## IV. Conclusion

In grappling with these difficult jurisdictional issues, the trial court observed that this case presented "a tough call," but ultimately found the Italian Companies subject to jurisdiction in Texas and denied their special appearances. We agree with the trial court's characterization, but not with its ruling. We find no basis for personal jurisdiction. Reid's claims do not arise from or relate to the Italian Companies' purposeful contacts with Texas and thus provide no basis for specific jurisdiction. Moreover, the record does not show that the Italian Companies have established continuous and systematic general business contacts with Texas sufficient to support general jurisdiction. Furthermore, the exercise of personal jurisdiction over them would be unreasonable and would offend traditional notions of fair play and substantial justice.

Having found that the Italian Companies are not subject to the jurisdiction of the trial court, we sustain the two issues they have asserted on appeal, reverse the trial court's order denying their special appearances, and remand this case to the trial court with instructions to dismiss the claims against the Italian Companies for lack of personal jurisdiction.

EDELMAN, J., dissents without filing an opinion.